CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
for Roanoke
OCT 30 2006
JOHN F. CORCORAN, CLERK
BY: M. Hupp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

|  |  |
|---|---|
| MICHAEL EUGENE MONTGOMERY, <br> Plaintiff, | ) Case No. 7:05CV00131 <br> ) <br> ) **MEMORANDUM OPINION** |
| v. | ) <br> ) By: Jackson L. Kiser <br> ) Senior United States District Judge |
| SIA JOHNSON, et al., <br> Defendants. | ) |

Before me now are the Defendants' Objections to the Magistrate Judge's Report and Recommendation. For the reasons stated herein, I will **ADOPT** the Report and Recommendation's ultimate conclusion, that the Defendant's Motion for Summary Judgment be **DENIED**, but not necessarily the reasoning behind that conclusion. The case will be **TRANSFERRED** to the Big Stone Gap Division for trail by the Court.

I.  **STATEMENT OF THE CASE**

On August 6, 2004, the Plaintiff, Michael Eugene Montgomery ("Montgomery"), an inmate incarcerated at the United States Penitentiary, Lee County, Virginia ("USP Lee"), participated in a protest staged in the outdoor cage of the special housing unit ("SHU") of that facility. Montgomery recounted that the inmates protested the lack of personal hygiene and cell

1

cleaning items in the SHU; the manner in which the staff processed incoming mail to the SHU; and the dearth of visits from the inmates' counselors, case managers, unit managers, and other personnel, known collectively as a unit team, at the SHU.

Montgomery refused to allow the officers present at the protest to place him in hand restraints unless they let him speak to a person with authority to redress his grievances. Rather than acquiesce to his demands, Montgomery claims, the correctional officers mounted ladders around the cage, riddled the cell with rubber bullets, and fired several canisters of chemical munitions into the cell. Over twenty bullets struck Montgomery directly, and some chemical projectiles hit him in the face. Consequently, he fell to the ground. Once Montgomery and the other inmates lay prone on the cell floor, the officers entered in riot gear and restrained the prisoners without further violence. Montgomery alleges that after the officers escorted him from the cell, they did not provide him with an adequate opportunity to wash the burning chemicals from his eyes before placing him in four point restraints for eighteen hours and ambulatory restraints for another twelve hours. At no time, Montgomery claims, did he act aggressively or in a threatening manner.

## II. PROCEDURAL BACKGROUND

Montgomery filed this present suit on March 7, 2005, pursuant to 42 U.S.C. § 1983 (2003) and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 396–98 (1971). Montgomery's complaint alleges claims based on mail tampering and excessive force, in violation of the Eight Amendment's prohibition against cruel and unusual punishment. U.S. CONST. amend. VIII. This court has jurisdiction under 28 U.S.C. § 1331 (2006).

2

The Defendants filed a Motion to Dismiss and alternatively a Motion for Summary Judgment. The Defendants claim that Montgomery failed to exhaust his administrative remedies and that his claims are therefore barred. *See* 42 U.S.C. 1997e(a) (2003) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The Magistrate Judge heard two days of evidence on the Defendants' motions and ultimately concluded that while Montgomery failed to exhaust his administrative remedies, that failure was excused because the Defendants did not supply him with access to the necessary paperwork to invoke those remedies. The Defendants filed a timely objection to the Magistrate Judge's Report and Recommendation and challenged the Magistrate Judge's finding that Montgomery did not have access to administrative remedies, credibility determinations, and reliance on certain prison documents. Consequently, the Defendants ask me to overrule the Report and Recommendation and grant their Motion for Summary Judgment. Montgomery has filed a letter in response.

## III. **LEGAL STANDARD**

As noted above, 42 U.S.C. 1997e(a) requires an inmate to exhaust available administrative remedies before filing a law suit challenging prison conditions. 42 U.S.C. § 1997e(a). However, exhaustion is neither a jurisdictional nor a pleading requirement. *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.3d 674, 678, 681, (4th Cir. 2005). Rather, it is an affirmative defense. *Id.* at 681. As a result, Montgomery's failure to exhaust his administrative remedies would not support a motion to dismiss for lack of subject matter

3

jurisdiction or a motion to dismiss for failure to state a claim upon which relief could be granted.[1] Therefore, the Magistrate Judge correctly treated the Defendants' motion as a motion for summary judgment.

Summary judgment is appropriate when no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). A genuine issue of a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247- 248 (1986). In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1129 (4th Cir. 1987). Nevertheless, when the record taken as a whole cannot lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial and summary judgment is appropriate; that is, the moving party is entitled to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Additionally, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Finally, when a party challenges a magistrate judge's findings of fact, the district judge

---

[1] The Fourth Circuit recognized that a district court might raise the issue of exhaustion *sua sponte* and dismiss a complaint in the rare case when it was apparent from the face of the complaint that the inmate failed to exhaust his administrative remedies. *Anderson*, 407 F.3d at 682. In light of the voluminous evidence produced on this issue before the Magistrate Judge, this does not appear to be such a case. Indeed, the complaint itself alleges that Montgomery sought to exhaust his administrative remedies but was unable to do so.

4

"shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1) (2002). To properly conduct a de novo review of the evidence, the reviewing court must independently consider the transcripts from the hearing before the magistrate judge. *Wimmer v. Cook*, 774 F.2d 68, 76 (4th Cir. 1985). "[A]s part of its obligation to determine *de novo* any issue to which proper objection is made, a district court is required to consider all arguments directed to that issue, regardless of whether they were raised before the magistrate." *United States v. George*, 971 F.2d 1113, 1118 (4th Cir. 1992). Finally, the reviewing judge may receive additional evidence but is not required to do so. 28 U.S.C. § 636(b)(1); *Virgin Enterprises Ltd. v. Virgin Cuts, Inc.*, 149 F.Supp 2d. 220, 223 (E.D. Va. 2000).

## IV. DISCUSSION

While Montgomery clearly failed to exhaust his administrative remedies in this case, numerous courts have excused an inmate's failure to exhaust when prison officials denied the inmate access to those remedies. *See, e.g., Abney v. McGinnis*, 380 F.3d 663, 667 (2d Cir. 2004) ("Defendants may also be estopped from raising non-exhaustion as an affirmative defense when prison officials inhibit an inmate's ability to utilize grievance procedures."); *Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir. 2003) (excusing prisoner's failure to exhaust when prison officials refused to provide the necessary forms); *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001) (holding that a prisoner need not exhaust remedies that prison officials' actions preclude the prisoner from pursuing because those remedies are not "available" within the meaning of 42 U.S.C. § 1917e(a)). The Defendants have not contested the principle that the unavailability of administrative remedies would excuse Montgomery's failure to seek them. Rather, they contend

5

that those remedies were available to Montgomery all along.

Under 28 C.F.R. § 542.14(a), Montgomery had to submit a form requesting a formal administrative remedy within twenty calendar days from the event upon which he based his complaint. Thus, Montgomery had to formally commence the grievance process by August 26, 2004. Montgomery and the Defendants each presented very different accounts of the SHU in general during that time period and specifically differed over the access inmates enjoyed to administrative remedy forms in the SHU during August of 2004.

At the hearing the following witnesses testified on behalf of the Defendants: William Story ("Story"), the Executive Assistant and Administrative Remedies Coordinator at USP Lee; Wardell Chambers ("Chambers"), Montgomery's Unit Manager; Kevin Bowling ("Bowling"), Montgomery's Case Manager through October 12, 2004; Dennis Peltier, a counselor at USP Lee; Lisa Eller ("Eller"), Montgomery's Case Manager from October 12, 2004 until he left USP Lee; and Michael Carrubba, Montgomery's Correctional Counselor after October 12, 2004.

Generally, those witnesses claimed that the SHU was orderly during August of 2004 and that inmates had routine access to a number of staff members who would have either provided appropriate administrative remedy forms or seen that another staff member provided such forms. Collectively, they testified that Montgomery could have requested an administrative remedy form from his assigned counselor, Unit Manager, Case Manager, and the Administrative Remedies Coordinator. Additionally, they claimed that Montgomery could have voiced his concern that he could not access administrative remedy forms to the Warden, Associate Warden, Captain, or Duty Officer and that any of those officials would have helped Montgomery acquire the appropriate forms.

6

The defense witnesses testified, after referencing the SHU log book, that Story made rounds on August 13, 18, and 24 during the period in question. Duty Officers made rounds in the SHU on August 6-20, 22, and 24-26. The Captain made rounds on August 9-13, 16-18, 20, 24, and 25. The Associate Warden made rounds on August 10, 12, 13, 23, and 25. The Warden made rounds on August 9, 13, 19, and 25. Bowling made rounds on August 6, 7, 14, 20, 21, 25, and 26.[2] Eller testified that she made rounds for the entire SHU, including Montgomery's cell, on August 8, 11, 15, 16, 18, and 22. Last, Chambers made rounds on August 17, 23, and 25.

Finally, the Defendants' witnesses uniformly stated that when they made rounds in the SHU, they would normally stop at each cell, ensure the prisoner was breathing, and offer to talk to the prisoner if the prisoner wished. Story unequivocally claimed that he saw the Plaintiff during the relevant time. The witnesses also stated that Montgomery was not an inmate who normally complained and that he only complained about the August 6 incident months later.

Montgomery's testimony painted a very different picture of the SHU during the month of August 2004; he described a cell block in disarray. He claimed that in August of 2004, the inmates housed in the SHU did not have access to toothbrushes, cleaning supplies, soap, and clean uniforms (he asserted that the inmates were reduced to washing their uniforms in their cell toilets). According to Montgomery, he did not receive his mail for months. Moreover, the staff only permitted the inmates infrequent and truncated opportunities to exercise, contrary to prison regulations. His witness Russell Martin ("Martin"), also an inmate in SHU during the relevant

---

[2]Montgomery admitted that he spoke with Bowling on August 7, the day after the incident. At the time he was still in restraints. Montgomery has repeatedly stated that he believed that if he asked for an administrative remedy form from Bowling on August 7, he would have remained in restraints for a longer period of time. The Defendants do not appear to seriously contend that this incident alone constituted sufficient access.

7

time period, supplemented this description by adding that inmates routinely refused to return meal trays to staff and jerked sprinkler heads off of their sockets. During that summer, Montgomery alleged that the unit teams did not make rounds in the SHU. Although he conceded that the team members would sign into the log book, Montgomery claimed that they merely stayed by the door on the lower tier of the cell block. Because Montgomery's cell was on the higher tier of the cell block, he was unable to view them and request administrative remedy forms. Montgomery admitted that other staff would pass by his cell, but claimed that when he asked them for the necessary forms, they told him they would ask his unit team.

Finally, Montgomery claimed that conditions in the SHU deteriorated so badly that it became the subject of a Bureau of Prisons Mid-Atlantic Regional Office investigation. As a result of the investigation, Montgomery alleged, USP Lee placed a log at the door of each prisoner's cell in the SHU and required the members of the unit teams to sign those logs each time they visited an inmate. Unfortunately, USP Lee did not install these logs until after August of 2004. The defense witnesses maintained that the investigation was a routine investigation. Moreover, they contended that USP Lee chose to place the logs at the cell door to facilitate communication between the staff. Thus, the logs were not the result of any investigation by the Mid-Atlantic Regional Office, according to the defense witnesses.

Clearly, the primary issue in this case is whether any of the staff who actually passed in front of Montgomery's cell during the time period in question could have provided Montgomery with the necessary forms to seek administrative remedies. Both sides agree that members of Montgomery's unit team could have provided him with the necessary forms. Moreover, the SHU log indicates that those people were actually present in the SHU during the time in question. The

8

parties disagree over whether those individuals actually made it to Montgomery's cell or if they simply remained near the entrance to the cell block. Additionally, both parties agree that some Duty Officers passed by Montgomery's cell. However, Montgomery claimed that those officers could not provide him with the administrative remedy forms and were ineffectual in relaying his requests to his unit team. The Defendants maintained that had Montgomery requested such a form from the officers, they would have supplied him with one.

The written evidence in this case does not strongly support either set of contentions. Plainly, the log book confirms both parties' versions of what happened in the SHU during August of 2004. The log book does indicate that members of Montgomery's unit team and the administration frequently visited the SHU during the time in question. However, Montgomery did not contest this point. Rather, he asserted that when those individuals visited the SHU, they did not pass by his cell. The log book does not indicate what the visitors to the SHU did during their visits. Rather, it only states what days they came and how long they stayed. Consequently, the log book is of limited value

The Defendants contended that Montgomery could have voiced his concerns to the Warden, Associate Warden, Captain, or Duty Officers. Montgomery claimed that his attempts to request administrative remedy forms from these individuals proved ineffectual. Apparently, any of these officers could have provided Montgomery with an inmate request to staff member form ("cop out form"). He could have then submitted the form to any of those officers who would have forward it in turn to the Warden or Associate Warden's office for review.

Both offices kept detailed logs of the cop out forms received during the time in question. When an inmate filed a cop out form, the office would refer the matter to the department that was

9

the object of the inmate's complaint. The department would respond to the office, which would then respond to the inmate.

The Warden's Inmate Request to Staff Member Log indicates that seventy-three inmates housed in the SHU from June 2004 to August 2004 submitted cop out forms to the Warden's office. Nearly one quarter of those complaints related to the administrative remedies program. Likewise, the Associate Warden's Inmate Request to Staff Member Log records 125 cop out forms from the SHU during that time frame. Although it is impossible to tell which entries came from the SHU in the Associate Warden's Inmate Request to Staff Member Log, many of the complaints also related to the administrative remedies process.

Again, the cop out logs do not strongly support either side. On the one hand, the logs indicate that inmates housed in the SHU during the relevant time period could voice their concerns about the administrative process to the staff and that the staff would make an appropriate inquiry. However, the logs do not show what the result of the inquiries were and if the inmates who made the requests ever actually received access to administrative remedy forms. Additionally, the fact that so many of the entries reflect dissatisfaction with the administrative review process supports Montgomery's claim that the process was not working during the summer of 2004.

The next pieces of written evidence in this case are cop out forms that Montgomery filed with the medical department. The first is a cop out form that Montgomery filed on May 17, 2004. Montgomery requested that he be placed on the list to have his teeth cleaned. His dental records indicate that Karen A. Johnson, R.D.H., provided that service on October 29, 2004. Montgomery filed the second request on August 5, 2004, one day before the protest. Unlike the

10

previous cop out, this one was not written on a standard form but on a piece of paper. In the second request, Montgomery complained of an ear infection. According to the form, Daniel E. DeJesus, M.D., visited Montgomery the same evening to evaluate his condition, but Montgomery declined to be examined. Finally, Montgomery claimed that a Ms. Catura gave him two cop out forms on August 15, one of which he used to complain about headaches, back pain, and vision loss and the other form he saved as a copy.

This evidence clearly supports the Defendant's case. It indicates that part of the prison staff was responsive to cop out forms. Moreover, the August 5 form suggests that inmates did not need to use official forms to garner a response. Consequently, although Montgomery asserted that he had difficulty obtaining such forms from the staff, the rapid response Montgomery's August 5 cop out received suggests that he could have simply written a request for administrative remedies on a blank sheet of paper. However, Montgomery does not assert that he had difficulties accessing medical care while in SHU. In fact, the record shows that he had access to medical personnel almost every day during the early part of August. Rather, Montgomery claims that his unit team, the entity in the prison primarily charged with dispensing administrative remedy forms, was not responsive to his request for forms with which to exhaust his remedies. Therefore, the fact that some individuals in the prison responded to cop out forms does not mean that all of the individuals in the prison did. Thus, while probative of the Defendants' claims, these cop out forms alone do not establish them beyond a genuine dispute.

Next, the Magistrate Judge placed great weight on the dearth of Segregation Review Orders ("SROs") concerning Montgomery during August of 2004. The SRO is a special housing review that the Captain or Lieutenant must complete periodically for each inmate housed in the

11

SHU. The purpose of the SRO is to ensure that the inmate has been fed, received required recreation, and understands why he remains in the SHU. While numerous SROs were conducted for Adam Martin during August of 2004, the Defendants were unable to produce any SROs for Montgomery during that time.

This evidence supports Montgomery's general claim that the SHU was not properly administered during August of 2004 and, as a result, that an inmate like Montgomery could slip through the cracks. However, as the Defendants point out, the SRO was to be conducted by the Lieutenant or Captain, not the unit team. Therefore, the absence of SROs pertaining to Montgomery during the time does not necessarily establish what access Montgomery had to his unit team. Therefore, the lack of SROs is of some, but not overwhelming, value.

Next, the Defendants claim that Montgomery has repeatedly stated that he did not pursue his administrative remedies until approximately January of 2005. For example, on September 21, 2005, Montgomery filed a proposed opening statement and a list of questions for witnesses. In those documents, he stated that he pursued his "Administrative remedies, From Jan 3rd 2005 till March of 2005." (Errors in original.) He also noted that he filed the present suit on March 1, 2005, "[a] full two month's [sic] after the first inquiry by myself to my unit team for my administrative remedies." During the evidentiary hearing, Montgomery also admitted that he filed a cop out form in which he wrote that he had repeatedly requested administrative remedies since January 1, 2005. The Defendants also cite numerous statements Montgomery made at trial while either testifying or questioning witness which indicate that he sought administrative remedies from the early part of 2005 but do not specify whether he did so in August of 2004.

The Defendants also allege that Montgomery himself stated that he "never tried until

12

June" to exhaust his administrative remedies. Because he filed an administrative remedy form in June of 2005, the Defendants interpret this as an admission that he did not attempt to seek administrative remedies until June of 2005 for the claim that is the subject of this case. As a result, the Defendants claim that Montgomery has admitted that he did not seek to exhaust his remedies until well after the twenty days had expired.

Finally, the Defendants note that Montgomery did not claim that the prison staff frustrated his attempts to exhaust his administrative remedies in his complaint. Rather, he only made this assertion after the Defendants raised that defense. Therefore, the Defendants contend, Montgomery has likely fabricated his story that the staff was not receptive to his attempts to seek administrative remedies in order to preserve his claim.

Again, this evidence is inconclusive. Montgomery has testified that he did not have sufficient access to his unit team until well after August of 2004. Therefore, the fact that he did not request the necessary administrative relief from them until the early part of 2005 supports his claim.[3] Moreover, when Montgomery stated that he did not seek to access his administrative remedies until June, he appeared to reference June of 2004, not 2005. When he made that statement, he was describing the causes behind the protest on August 6, 2004.[4] Last, the

---

[3] These statements might also constitute an admission that Montgomery did not ask other staff members for the forms as well. However, one of the statements the Defendants rely on is specifically modified by the phrase "after the first inquiry by myself to my unit team for my administrative remedies." Obviously, Montgomery is not highly educated and does not always speak with perfect precision. Therefore, Montgomery possibly meant to so modify all of these statements. Because Montgomery is the non-moving party, he should receive the benefit of this inference for the purposes of this motion for summary judgment. *Shaw*, 13 F.3d at 798.

[4] Indeed, the DVD footage of that incident shows that the inmates specifically complained about the lack of access to unit teams.

13

Defendants' assertion that Montgomery failed to claim he could not utilize the grievance process in a timely fashion in his original complaint is simply untrue. The complaint he filed on March 7, 2005, plainly states that he did not file a timely request for administrative remedies because he was "denied grievance process, still attempting access."

Finally, the Defendants assert that inmate Martin's testimony is contradictory. Martin was Montgomery's cell mate during August of 20004. On direct examination, Martin testified that Montgomery had asked his unit team for administrative remedy forms in the weeks immediately after the incident occurred. However, he had stated earlier that the unit teams had not visited Montgomery during that time period. Clearly, these statements are contradictory. Moreover, Martin's claim that Montgomery had actually asked his unit teams for administrative remedy forms in August of 2004 directly contradicts Montgomery's claim that he did not see his unit team that month.

This evidence is also inconclusive. Martin himself recognized that because he had spent so much time in the SHU, his memory of dates was likely confused. Therefore, his chronological errors are of minor probative value. Moreover, most of his testimony merely collaborated Montgomery's. Consequently, any contradictions in Martin's testimony are of limited value in resolving this dispute.

As noted above, this case comes before me on a motion for summary judgment. Therefore, I do not need to determine which witnesses were more credible than others. Rather, I must only decide if the Defendants have shown that there is no genuine issue as to any material fact. The material fact in dispute is the access Montgomery enjoyed to his administrative remedies in August of 2004. On this topic, the oral testimony from the Defendants' witness

14

conflicted with Montgomery and Martin's testimony. The written evidence that relates to this point supports both sides. Although the Defendants point to some inconsistencies in Montgomery and Martin's testimony, these contradictions are relatively minor. Taking the evidence as a whole, I find that a genuine issue does exist with respect to the question of whether Montgomery was able to seek administrative remedies in the twenty days following August 6, 2004, such that a reasonable juror could return a verdict for Montgomery, the non-moving party. Consequently, the motion for summary judgment will be denied. Because credibility determinations are irrelevant to my decision, I need not adopt any portion of the Report and Recommendation that made such a finding and decline to do so.

## V. CONCLUSION

For the reasons stated above, I will **ADOPT** the recommended disposition in the Magistrate Judge's Report and Recommendation and, consequently, will **DENY** the Defendant's Motion for Summary Judgment. The case will be **TRANSFERRED** to the Big Stone Gap Division for trial by the Court.

The Clerk is directed to send a certified copy of this Memorandum Opinion and the attached Order to all counsel of record.

ENTERED this 30th day of October, 2006.

*/s/ Jackson L. Kiser*
Senior United States District Judge

15