CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

FEB - 7 2007

JOHN F. CORCORAN, CLERK
BY: ＿＿＿＿＿＿＿＿＿
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| MICHAEL EUGENE MONTGOMERY,<br>Plaintiff, | ) ) ) ) ) | Case No. 7:05CV00131 |
| | ) | **MEMORANDUM OPINION** |
| v. | ) ) ) ) | By: Jackson L. Kiser<br>    Senior United States District Judge |
| SIA JOHNSON, et al., | ) ) ) | |
| Defendants. | ) ) ) ) | |

Before me now are the Defendants' Objections to the Magistrate Judge's Report and

Recommendation. For the reasons stated herein, I will **ADOPT** the Report and

Recommendation in part and **REJECT** it in part. The Defendants' Motion for Summary

Judgment will be **DENIED** in part and **GRANTED** in part. The case will be **REASSIGNED** to

the Big Stone Gap Division for trial by the Court.

I.      **STATEMENT OF THE CASE**

On August 6, 2004, the Plaintiff, Michael Eugene Montgomery ("Montgomery"), an

inmate incarcerated at the United States Penitentiary, Lee County, Virginia ("USP Lee"),

participated in a protest staged in the outdoor cage of the special housing unit ("SHU") of that

facility. Montgomery recounted that the inmates protested the lack of personal hygiene and cell

1

cleaning items in the SHU, the manner in which the staff processed incoming mail to the SHU, and the dearth of visits from the inmates' counselors at the SHU. Montgomery refused to allow the officers present at the protest to place him in hand restraints unless they let him speak to a person with authority to redress his grievances. The officers declined Montgomery's request and attempted to restore order.

The video footage in this case provides an indisputable chronicle of the Defendants' response to Montgomery and the other recalcitrant inmates. The footage shows that the inmates had barricaded themselves into a cell in the recreation areas of the SHU. A sliding door was the only entrance to the cell. An inmate had tied a bed sheet around the top of the door and a jumpsuit around the bottom of the door in order to hinder access to the cell. When the prison officials attempted to convince the inmates to leave the cell voluntarily, they refused and indicated that they would only leave when forced. Various officials tried to reason with the inmates for almost two hours. Their efforts were unsuccessful. Moreover, upon learning of the disturbance in the recreation area, other inmates inside the SHU became agitated and refused to submit to hand restraints when asked to do so by prison officials. Fortunately, the staff successfully convinced these inmates to submit to hand restraints and quelled the disturbance before utilizing force against the inmates in the recreation area.

Around 3:10 p.m., nearly two hours after the inmates began their protest, the prison officials released pepper spray into the cell. This primary use of force failed to subdue the inmates, who continued to pace around the cell, shout obscenities, and taunt the guards. The guards ordered the inmates to lie down immediately after they fired the pepper spray. The inmates refused to comply with this command. As a result, the officers fired more pepper spray

2

and pepper balls[1] into the cell. Montgomery and other inmates shouted obscenities and continued to remain upright despite the guards continued orders to lie down. The guards responded by firing more gas and pepper balls into the cell. Finally, the inmates fell to the ground. Nonetheless, when one guard began to cut the cloth holding the door shut, a prisoner, inmate Francis Lang ("Lang"), suddenly rose and charged at the guard. Lang returned to the ground when another guard fired a warning shot from a stun gun. At this point, the prison officials entered the cell and restrained the inmates. A nurse immediately checked the condition of each inmate, once restrained.

After the prison officials subdued the inmates, the officers escorted Montgomery and his fellow protestors into the SHU. One nurse applied a saline solution to Montgomery's eyes three times once he was inside the SHU, after he complained that the pepper spray burned his eyes. The officers provided Montgomery with a brief shower. The officers then applied four point restraints to Montgomery and the rest of the inmates involved in the disturbance. Montgomery continued to complain that his eyes burned, so a nurse again flushed Montgomery's eyes with a saline solution while inspecting his wounds from the pepper balls. Montgomery continued to complain about his eyes, but the prison staff provided him with no further assistance, apart from

---

[1]Pepper balls are plastic balls that burst upon contact and release a powdered form of pepper spray. Montgomery claims that the guards used rubber bullets to subdue the inmates. The Magistrate Judge reached the same conclusion. The guards state in their affidavits that they fired pepper balls. Likewise, the nurse who examined Montgomery after the incident believed that pepper balls inflicted his wounds. My conclusions today do not rest on which type of munition the guards fired. I do not find that one type of munition equates to a substantially greater application of force than the other. *See* 28 C.F.R. § 552.25 (2006) (permitting the warden of a prison to authorize the use of both chemical agents and "non-lethal weapons" in limited circumstances). For ease of reference, I will refer to the shot fired by the guards as pepper balls throughout the remainder of this opinion.

Case 7:05-cv-00131-JPJ-PMS   Document 141   Filed 02/07/07   Page 3 of 19   Pageid#: 921

advice to keep his eyes open. Montgomery remained in four point restraints for eighteen hours. Once the guards released him from four point restraints, they placed him in ambulatory restraints for another twelve hours.

## II.     PROCEDURAL BACKGROUND

Montgomery filed this present suit on March 7, 2005, pursuant to 42 U.S.C. § 1983 (2003) and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Montgomery's Complaint alleges claims based on mail tampering and excessive force and denial of medical treatment in violation of the Eight Amendment's prohibition against cruel and unusual punishment. U.S. CONST. amend. VIII. This court has jurisdiction under 28 U.S.C. § 1331 (2006).

The Defendants filed a second Motion to Dismiss, or in the Alternative, Motion for Summary Judgment on December 12, 2005. The Defendants claimed that Montgomery had not produced sufficient evidence on his Eighth Amendment and mail tampering claims to survive a motion for summary judgment. Also, the Defendants claimed that they were entitled to qualified immunity and that Defendants Bondurant, Johnson, and Friss could not be liable on Montgomery's excessive force claim because they had no direct involvement in the use of force.

The Magistrate Judge found that the Defendants were entitled to judgment as a matter of law on Montgomery's mail tampering claim. Additionally, the Magistrate Judge recommended that I enter summary judgment on behalf of Lieutenant Friss with respect to Montgomery's Eighth Amendment claims. Montgomery did not object to either finding.

Next, the Magistrate Judge recommended that I deny the Defendants' request for

4

Summary Judgment with respect to Mongtomery's Eighth Amendment claims against the remaining Defendants. Specifically, the Magistrate Judge found that a genuine issue existed concerning whether Mongtomery had produced sufficient evidence to support his claims, whether the Defendants were entitled to qualified immunity, and whether Defendants Johnson and Bondurant were sufficiently involved in the incident to be held liable. The Magistrate Judge also concluded that the Defendants denied Montgomery adequate medical treatment after the protest. The Defendants have objected to all of these findings, and I will consider each *de novo*.

## III. LEGAL STANDARD

Summary judgment is appropriate when no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). A genuine issue of a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247- 248 (1986). In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citations omitted); *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1129 (4th Cir. 1987). Nevertheless, when the record taken as a whole cannot lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial and summary judgment is appropriate; that is, the moving party is entitled to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Additionally, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

5

evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

When a party challenges a magistrate judge's report and recommendation, the district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1) (2002). "[A]s part of its obligation to determine *de novo* any issue to which proper objection is made, a district court is required to consider all arguments directed to that issue, regardless of whether they were raised before the magistrate." *United States v. George*, 971 F.2d 1113, 1118 (4th Cir. 1992). Finally, the reviewing judge may receive additional evidence but is not required to do so. 28 U.S.C. § 636(b)(1); *Virgin Enterprises Ltd. v. Virgin Cuts, Inc.*, 149 F.Supp 2d. 220, 223 (E.D. Va. 2000).

## IV. DISCUSSION

### A. EXCESSIVE FORCE

The Eighth Amendment to the United Sates Constitution prohibits "cruel and unusual punishments." "Not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny, however. After incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (internal quotations omitted) (alteration in original). To establish a violation of the Eighth Amendment, a prisoner must show that "the prison official acted with a sufficiently culpable state of mind (subjective component) and [that] the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). To evaluate the subjective component, in the context of a prison disturbance, a court must determine " '

6

'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' ' " *Stanley v. Hejirika*, 134 F.3d 629, 634 (4th Cir. 1998) (*quoting Hudson v. McMillian*, 503 U.S. 1, 6 (1993) (*quoting Whitley*, 475 U.S. at 320-21))). A prisoner need only prove more than "*de minimis* pain or injury" to satisfy the objective component. *Williams*, 77 F.3d at 761.

The United States Supreme Court has enumerated several factors that a court should consider to determine whether a prisoner has produced sufficient evidence to satisfy the subjective component. *Hudson*, 503 U.S. at 7. Those factors include " '(1) the need for application of force, (2) the relationship between that need and the amount of force used, (3) the threat reasonably perceived by the responsible officials, and (4) any efforts made to temper the severity of a forceful response.' " *Williams*, 77 F.3d at 762 (*citing Hudson*, 503 U.S. at 7 (citations omitted)). In evaluating the subjective component, a "court may allow an inmate's claim to go to the jury only if it concludes that the evidence, viewed in a light most favorable to the claimant, 'will support a reliable inference of wantonness in the infliction of pain.' " *Stanley*, 134 F.3d at 634 (*quoting Whitley*, 475 U.S. at 322). Finally, the Supreme Court has admonished lower courts to show a " 'wide-ranging deference' " to prison officials' responses to disorderly inmates. *Whitley*, 475 U.S. at 321-22 (*quoting Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). That deference "does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." *Id.* at 322.

In this case, Montgomery's excessive force claim challenges three actions by the Defendants: (1) the initial use of force, (2) the initial decision to place him in four point

7

restraints, and (3) the subsequent decision to leave him in four point restraints for a total of eighteen hours. Under the principles stated above, I believe that Montgomery has only produced enough evidence to survive a motion for summary judgment on the third portion of his excessive force claim.

### 1. INITIAL USE OF FORCE

Under the *Whitley* factors, the Defendants appear to have held a good faith intention to restore order, not an intention to hurt the inmates wantonly when they initially used force to end the demonstration in the SHU. First, the guards needed to use force to end the disturbance. Four inmates had barricaded themselves into a cell and had plainly indicated that they did not intend to leave peacefully. Moreover, that disturbance had begun to spread, albeit on a limited scale, to other inmates inside the SHU. In such a case, force was obviously the only means to restore order to the SHU.

Next, the prison officials used no more force than was necessary to subdue the inmates. Initially, the guards only used pepper spray to force the inmates to lie down so that the officers could safely enter the cell and restrain the inmates. When that force proved ineffective, the officers escalated the force and used pepper spray and shot the inmates with pepper balls. When that attempt failed, the guards applied the same level of force again, which successfully caused the inmates to lie down. However, even this amount of force was not completely effective in subduing the inmates because Lang still tried to lunge at a guard who was trying to open the cell door. Again, a guard judiciously fired a warning shot from a stun gun at the prisoner, which finally convinced him to lie down. Under these facts, the guards clearly used no more force than was necessary to subdue the prisoners.

8

The third factor does not as clearly support the use of force as the other factors. Certainly, the guards were not in any imminent physical danger from the inmates barricaded in a recreation cell. However, the guards did perceive a threat to order posed by the inmates unwillingness to leave the cell. Moreover, this disorder had begun to spread to other parts of the prison, although at the time of the use of force the secondary disturbance had dissipated. Consequently, the guards did perceive a threat but not a dire one.

Finally, the guards took numerous steps to allay the severity of the force they applied. They spent over two hours attempting to convince the prisoners to exit the cell peacefully. They utilized escalating levels of force to ensure that they only used the minimum amount of force necessary to end the demonstration. Finally, the prison officials had medical personnel examine the inmates immediately after the incident.

Considering all of these factors, I do not believe that a reasonable fact finder could determine, without substituting his or her judgment for the Defendants' judgment, that the Defendants acted out of malice as opposed to a good faith desire to restore order. The inmates made it perfectly clear that they would not leave their cell voluntarily and the prison officials used escalating levels of force, initiated conflict avoidance procedures, and provided medical aid to the inmates after the incident. Thus, Montgomery cannot satisfy the subjective component of his Eighth Amendment claim with respect to the initial use of force.

### 2. INITIAL PLACEMENT IN FOUR POINT RESTRAINTS

Factually, the decision to initially place Montgomery in four point restraints is quite similar to the one that the Fourth Circuit considered in *Williams*. In that case, prison officers sprayed mace on several inmates who had splashed them with a liquid, which the inmates

9

claimed was water. *Williams*, 77 F.3d at 762. Ten minutes after subduing the inmates, the

guards placed the inmates in four point restraints without providing them with an opportunity to

wash the residue from the mace off of their bodies. *Id.* at 763, 765. The guards acknowledged

that the inmates ceased throwing the liquid at them but claimed that they continued "hollering."

*Id.* at 764.

The Fourth Circuit concluded that, under the *Whitley* factors, the decision to use four

point restraints did not evince a "sadistic or malicious intent" to punish the inmates. *Id.* at 764.

The court reiterated that the proper focus of the inquiry was not whether the guards' actions were

strictly necessary, but whether they showed an intent to wantonly punish the inmates. *Id.* at 763-

64.

> When the officers decided to confine Williams in the restraints, only minutes had
> elapsed since the disturbance had begun, Williams was still "hollering," and it was
> not obvious that the disturbance had ended. In view of these undisputed facts, we
> cannot conclude that there was no "need" for the application of force or that the
> guards were unreasonable in their apparent belief that the imposition of four-point
> restraints was necessary to obtain "order and control."

*Id.* at 764. In light of the court's decision in *Williams*, an analysis of the *Whitley* factors in this

case supports the conclusion that the guards actions were undertaken to restore order, not inflict

unnecessary pain on Montgomery. First, as in *Williams*, the guards placed Montgomery in four

point restraints almost immediately after the initial disturbance. Montgomery and the other

protestors had proven resistant to early shows of force. They had previously declined to lie on

the ground even after being shot with pepper balls and pepper spray. Therefore, although they

had ceased their obstinate behavior, the guards in this case had reasonable grounds to believe that

the disturbance may not have ended. As a result, I believe that under the first and third *Whitley*

10

factors, the guards may have still reasonably perceived that Montgomery was a threat and consequently considered the application of additional force necessary.

Under the second and fourth *Whitley* factors, the guards apparently made some efforts to mitigate the application of force. Unlike the guards in *Williams*, the Defendants provided Montgomery with an opportunity to wash some of the chemicals from his body and allowed a nurse to rinse his eyes. Moreover, pepper spray is considerably milder than mace. *Jackson v. Morgan*, 19 Fed. Appx. 97, 102 (4th Cir. 2001) ("Pepper spray is a milder irritant and is employed to avoid physical confrontation among inmates and guards; whereas [mace] was used primarily as a weapon with greater consequences and required more thorough decontamination."). As a result, the guards' decision in *Williams* to place the inmate in four point restraints after spraying him with mace and not giving him a chance to rinse his body evinced far less concern for the inmate's well being than the guards showed toward Montgomery in this case. Given Montgomery's continuing complaints, it appears that these efforts to cleanse the chemicals from his body were not successful. Nonetheless, the guards did attempt to alleviate some of the pain Montgomery felt.

Therefore, I believe that in light of *Williams* and *Whitley*, the evidence indicates that the prison guards did not act wantonly in placing Montgomery in four point restraints. The need for force at this juncture was probably less than when the guards initially fired pepper spray and pepper balls into the outdoor cell. Nonetheless, the guards placed Montgomery in four point restraints moments after a disturbance, during which the inmates dramatically resisted the officials even after enduring a substantial application of force. Additionally, the guards took steps to alleviate the force by providing Montgomery some medical treatment. Therefore, I do

11

not believe that there are sufficient facts in this case upon which a fact finder could conclude that the Defendants acted maliciously in initially choosing to restrain Montgomery.

### 3.   CONTINUED PLACEMENT IN FOUR POINT RESTRAINTS

Last, I must consider whether the Defendants decided to leave Montgomery in four point restraints for malicious purposes or out of a good faith desire to maintain order. The Defendants maintain that Montgomery continued to act combatively and threatened prison officials who attended him for many hours while he was in restraints. As a result, they argue that they were justified in leaving Montgomery in the four point restraints. They have produced a log book to support this assertion. In contrast, Montgomery denies that he threatened anybody while in the restraints. The video footage that shows Montgomery during the first minutes of his confinement in four point restraints supports his assertion. During that twenty minute period, he did not make any threats to the numerous prison officials in his cell. Moreover, the guards released both Montgomery and Lang from the four point restraints at the same time. This supports the inference that the guards did not restrain Montgomery until he became complacent but instead had a set time when they planned to release all of the inmates, regardless of the threat they posed while bound. Therefore, for purposes of this Motion for Summary Judgment, I believe that Montgomery can satisfy the subjective component of his claim with respect to the decision to leave him in four point restraints.

Nonetheless, he must also satisfy the objective component for this part of his excessive force claim to proceed. Montgomery contends that he suffered more than a *de minimis* pain or injury when he was covered in pepper spray and forced to lie prone for eighteen hours while the pepper spray burned his eyes and wounds. In contrast, the Defendants have provided the court

12

with the Declaration of Sandra Callahan ("Callahan"), a registered nurse employed at USP Lee. Callahan states that "the effects of pepper spray dissipate quickly." Montgomery has not produced any medical evidence to the contrary. Indeed, in the footage depicting his release, the burning sensation that formerly plagued Montgomery had clearly ceased. For purposes of this motion, I must assume that the effects of pepper spray are not long lasting. Thus, during the majority of his time in four point restraints, Montgomery could not medically have suffered from the burning sensation which was obviously so painful to him initially.

Consequently, the primary pain or injury of which Montgomery can complain is the pain associated with remaining in four point restraints for eighteen hours.[2] While the Defendants maintain that Montgomery was provided with one break to eat and use the bathroom, Montgomery has stated in his affidavit that the guards did not afford him such opportunities. As a result, he had to urinate on himself while in the restraints. The video footage showing Montgomery's release supports this assertion by recording statements from the guards and a nurse that many of the items in Montgomery's cell were covered in urine. Because the Defendants are the moving party, I will consider the evidence in the light most favorable to Montgomery and conclude that he did not receive any breaks from his restraint.

Several courts in the Fourth Circuit have considered whether the pain that results from a lengthy confinement in restraints will satisfy the objective component of an excessive force claim. In *Jackson*, the Fourth Circuit considered whether a prisoner had shown sufficient

---

[2]Montgomery contends that as a result of the Defendants' actions he suffers from blurred vision, scar tissue, nerve damage to his lower back, and post-traumatic stress syndrome. Clearly, these are injuries that resulted from the initial use of force. Because that force resulted from the Defendants' good faith efforts to restore order, such injuries will not support Montgomery's excessive force claim.

evidence of *de minimis* pain or injury to support a jury verdict. 19 Fed. Appx. 98-100. Prison guards had sprayed the inmate with pepper spray after a prison disturbance. *Id.* at 99. They allowed the inmate to wash himself before placing him in three point restraints in an isolation cell for two days. *Id.*. Based on these facts, the Fourth Circuit concluded that no reasonable fact finder could determine that the inmate suffered sufficient pain or injury to satisfy the objective component of an excessive force claim. *Id.* at 103. Other district courts in the Fourth Circuit have determined that completely immobilizing an inmate in five point restraints for nearly forty-eight hours, with periodic breaks from restraint, constitutes more than a *de minimis* injury. *Card v. D.C. Department of Corrections*, 2005 WL 2260167, at *6 (E.D. Va. September 13, 2005); *Sadler v. Young*, 325 F. Supp. 2d 689, 704 (W.D. Va. 2004) *rev'd on other grounds*, 118 Fed. Appx. 762 (4th Cir. 2005).

In light of these precedents, I believe that Montgomery has produced sufficient evidence of pain for the purposes of a motion for summary judgment. The Fourth Circuit has admonished lower courts to "be wary of finding uses of force that inflict 'merely' pain but not injury to be *de minimis,* and therefore beyond requiring justification under the Eighth Amendment." *Williams*, 77 F.3d at 762 n.2. While the inmate in *Jackson* was restrained for nearly forty-eight hours, he only endured three point restraints, instead of the more restrictive four point restraints. This enabled the inmate to wipe his face, eat, and partially control his urination, all activities that Montgomery alleges that he was unable to do. *Jackson*, 19 Fed. Appx. at 103. That inmate's ability to wipe his face is a critical distinction in light of the fact that guards sprayed both him and Montgomery in the eyes with pepper spray. Consequently, at least in the early part of his confinement, Montgomery likely suffered substantially more pain than the inmate in *Jackson*,

14

because Montgomery did not have a free hand with which to wipe his face. Therefore, although Montgomery spent a shorter period of time in restraints, the severity of that restraint, and corresponding potential for pain that exceeds the *de minimis* level, was significantly greater. Likewise, while the inmates in *Card* and *Sadler* lay in five points restraints for almost three times as long as Montgomery did in four point restraints, the guards provided them with temporary breaks from their restraints. Montgomery's evidence indicates that the prison officials did not provide him with such an opportunity. At the most, the guards afforded him one break from his shackling. Thus, in at least one respect, his confinement was more severe than the inmates in *Card* and *Sadler*. On this record, I cannot conclude that no reasonable fact finder would determine that Montgomery's pain was *de minimis*. Therefore, I will allow Montgomery to proceed to trial on his excessive force claim on the limited issue of whether the Defendants' decision to let him remain in four point restraints violated the Eighth Amendment.

## B. DENIAL OF MEDICAL TREATMENT

In his complaint, Montgomery contends that he was denied "medical attention to open wounds on [his] back." The Magistrate Judge found that a genuine issue of fact existed concerning this claim. A prisoner may allege a claim of inadequate medical treatment under the Eighth Amendment, and like a claim for excessive force, a claim for insufficient medical care has an objective and subjective component. *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998). The objective medical component requires the inmate to show a serious medical condition. *Id.* Thus, proving the objective component of a medical treatment claim is more difficult than proving the objective component of an excessive force claim. *Williams*, 77 F.3d at 761. In contrast, proving the subjective component of an inadequate medical treatment claim under the

15

Eighth Amendment is easier than proving the subjective component of an excessive force claim. *Id.* "The subjective component is satisfied by showing deliberate indifference by prison officials." *Johnson*, 145 F.3d at 167. Deliberate indifference exists when the prison officials know of circumstances concerning an inmates condition from which the official could infer that the inmate was at substantial risk of serious harm and the official actually reaches that conclusion. *Id.* The official will not be liable if he or she was aware of the facts surrounding the inmate's condition, but erroneously concluded that those facts posed no harm to the inmate. *Id.*

In light of these precedents, Montgomery's claim must fail for a number of reasons. First, the uncontroverted evidence on the record indicates that the prison officials were not indifferent to Montgomery's condition. The video tapes indicate that the prison officials ordered a nurse to examine Montgomery immediately after the incident. While the nurse was unable to examine the wounds on his back, she examined similar wounds on his front, and concluded that the wounds posed no substantial risk to Montgomery's health. Even if the nurse's initial failure to examine Montgomery's back was negligent, the nurse certainly believed that those wounds would not lead to a serious condition. In her affidavit, she stated that wounds from pepper balls are not serious and that identical wounds on his chest and arms did not appear serious. Therefore, the nurse clearly concluded that Montgomery's wounds did not pose a serious risk to his health. As a result, he cannot show deliberate indifference and cannot satisfy the subjective element of this claim.

Likewise, Montgomery cannot satisfy the objective component because the wounds on his back were not a serious condition. In *Johnson*, the Fourth Circuit found a pituitary tumor that eventually led to an inmate's blindness to be a serious medical condition. *Johnson*, 145 F.3d at

16

168. In *Howard v. Smith* the Fourth Circuit determined that a broken or dislodged bone could be a serious medical condition. 87 Fed. Appx. 309, 310 (4th Cir. 2004). The court has also found that an inmate who had a plate attached to his ankle which caused excruciating pain when he walked and according to his orthopedist could only be fixed by surgery was a serious condition. *Clinkscales v. Pamlico Correctional Facility Med. Dep't*, No. 00-6798, 2000 WL 1726592, at *1 (4th Cir. Nov. 21, 2000). Certainly, the minor wounds that Montgomery suffered on his back are not of the same severity as a broken bone, a painful and permanent foot condition requiring surgery, or blindness. Therefore, I also believe that Montgomery has failed to produce sufficient evidence on the objective portion of his medical neglect claim to proceed on that claim.

### C.   PERSONAL INVOLVEMENT

In the Fourth Circuit, a plaintiff asserting a *Bivens* claim must show that his or her injuries resulted from the personal actions of government officials. *Howard v. Federal Bureau of Prisons*, No. 99-6708, 1999 WL 798883, at *1 (4th Cir. October 7, 1999) (*citing Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995) (finding that *Bivens* will not support a claim based on respondeat superior). The Defendants object to the Magistrate Judge's finding that Captain Bondurant ("Bondurant"), Lieutenant L. Shults ("Shults"), and Special Investigative Agent Johnson ("Johnson") had sufficient personal involvement with the facts of this case to be liable. In light of my above holdings, I conclude that this case should not proceed against Johnson and Shults but should proceed against Bondurant.

With respect to Johnson, Montgomery has never alleged that Johnson was responsible for Montgomery's continued placement in four point restraints or even the initial decision to place him in four point restraints. Indeed, Montgomery's response to the Defendants' objections

17

primarily focuses on the role that Johnson played preceding the initial use of force. However, because I have found that use of force constitutional, Johnson cannot be held liable for whatever decisions he made that led to the first encounter. Because Montgomery has not produced any evidence that suggests Johnson could be held liable for the remaining portions of the claims in this suit, I find that Johnson should be dismissed from this suit. Additionally, the Defendants argue that Defendant Lieutenant L. Shults ("Shults") cannot be held liable for the decisions to place Montgomery in four point restraints and allow him to remain in such restraints. Montgomery's claims against Shults appear to primarily arise from his role in the initial response to the protest. Therefore, I will dismiss Shults from the case for the same reasons I will dismiss Johnson.[3]

Bondurant presents a more difficult issue. In his affidavit, Bondurant states that he was not at the prison on August 6, 2006 and played no role in the use of force against the inmates. Montgomery contends that Bondurant authorized the use of force via telephone and Montgomery has sworn that Bondurant was the party ultimately responsible for deciding to leave Montgomery in four point restraints. Moreover, Montgomery claims that Bondurant was at the institution at 7:35 a.m. on August 7, reviewed the video footage of the events from the day before, and decided to allow Montgomery to remain in the restraints. Given, Bondurant's position at USP Lee, I believe that a genuine question of fact exists as to whether he authorized Montgomery's continued placement in the four point restraints and Montgomery's claim should proceed against

---

[3]Montgomery alleged in his response to the Defendants' objections that Johnson and Shults asked the staff to neglect Montgomery while he was restrained. Montgomery has not alleged this in his complaint and has not produced any factual evidence, such as a statement in an affidavit, to support this claim.

18

Bondurant.[4]

## V.     CONCLUSION

For the reasons stated above, I will **ADOPT** the recommended disposition in the

Magistrate Judge's Report and Recommendation in part and **REJECT** it in part. Montgomery

may proceed on his excessive force claim with respect to the decision to allow him to remain in

four point restraints against Bondurant. Montgomery's other claims will be dismissed against

Bondurant. Moreover, all of Montgomery's claims against Shults, Friss, and Johnson will be

dismissed. Consequently, I will **GRANT** the Defendants' Motion for Summary Judgment in part

and **DENY** it in part. The case will be **REASSIGNED** to the Big Stone Gap Division for trial

by the Court.

The Clerk is directed to send a certified copy of this Memorandum Opinion and the

attached Order to all counsel of record.

ENTERED this _7th_ day of February, 2007.

_Jackson L. Kiser_
Senior United States District Judge

---

[4]The Magistrate Judge found that Bondurant was not entitled to qualified immunity and
the Defendants have not objected to that finding. Because I have already dismissed all of
Montgomery's claims against Shults and Johnson, I need not consider their objections to the
Magistrate Judge's finding that they were not entitled to qualified immunity.

19