# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **MICHAEL E. MONTGOMERY**, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:05CV00131 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **S.I.A. JOHNSON, ET AL.,** | ) | By:  James P. Jones |
| | ) | Chief United States District Judge |
| Defendants. | ) | |

*Michael E. Montgomery, Plaintiff Pro Se; Julia C. Dudley, Acting United States Attorney, Roanoke, Virginia, for Defendants Shults, Peltier, Lopez, and Corriveau.*

In this *Bivens* action by a federal prison inmate based on his being subjected to pepper spray and placed in four-point restraints by prison guards, I find that the addition to the lawsuit of new defendants is not barred by the statute of limitations based on the application of Federal Rule of Civil Procedure 15(c)(2).  In addition, I find that two of the officers are entitled to summary judgment based on qualified immunity, but that the claims against the other two officers must go to trial.


I

The plaintiff Michael E. Montgomery, an inmate at United States Penitentiary Lee County ("USP Lee"), located in this judicial district, filed this pro se action for monetary damages under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  The present defendants, current or former officers at USP Lee, have moved to dismiss or alternatively, for summary judgment, which motions are ripe for decision.

Because the defendants argue that Montgomery's claims are time-barred, a detailed review of the complicated procedural history of the case is necessary.

Suit was first filed in early March of 2005. Among other claims, Montgomery alleged that on August 6 and 7, 2004, prison officials at USP Lee used excessive force and wantonly inflicted physical and psychological injuries on him. It is alleged that USP Lee corrections officers fired chemical munitions and rubber bullets at Montgomery and other inmates who were staging a "sit in" at the prison's Special Housing Unit ("SHU") recreation area. Montgomery was hit multiple times and within seconds, obeyed orders to lie down to be restrained. He made verbal complaints of severe eye discomfort, and officers afforded him a few seconds in the shower and several saline rinses for his eyes. Although Montgomery alleges that his complaints of pain continued, officers placed him in four-point restraints on his back where he remained for eighteen hours. He claims that he did not get regular meals or bathroom breaks during this time. After releasing Montgomery from the four-point restraints, officers placed him in ambulatory restraints for an additional twelve hours.

In the original Complaint, Montgomery sued four supervisory officials: Security Investigation Agent ("S.I.A.") Johnson, Captain Bondurant, Lieutenant Friss, and Lieutenant Shults (first identified as Shultz), seeking compensatory and punitive damages. He also moved to proceed in forma pauperis, pursuant to 28 U.S.C.A. § 1915 (West 2006).

In docketing the Complaint conditionally, the court administered its standard procedures in addressing civil rights complaints from pro se, indigent prisoners and

required Montgomery to provide information about his trust account activity and his exhaustion of administrative remedies. He responded, stating that he had attempted to exhaust such remedies, but that prison officials had thwarted his efforts. He subsequently consented to pay the court's filing fee through installments, and on April 27, 2005, the clerk mailed a Notice of Waiver of Service to the defendants, to the Office of the United States Attorney in Roanoke, and to the Office of the Attorney General in Washington, D.C. On June 29, 2005, an Assistant United States Attorney ("AUSA") filed a Motion to Dismiss or in the Alternative, Motion for Summary Judgment, on behalf of all the defendants on the grounds that Montgomery had not exhausted his administrative remedies before filing the lawsuit as required under 42 U.S.C.A. § 1997e(a) (West 2003).

Montgomery responded to the motion and on August 4, 2005, Senior District Judge Jackson L. Kiser, to whom the case was initially assigned, referred the case to Magistrate Judge Michael F. Urbanski to conduct an evidentiary hearing on the issue of exhaustion of administrative remedies. Judge Urbanski first attempted to conduct the evidentiary hearing via video conferencing, but equipment problems frustrated his efforts. He then determined that judicial economy did not support holding an evidentary hearing at that stage of the litigation. Instead, he took under advisement the defendants' motions and ordered them to respond on the merits of Montgomery's claims.[1]

---

[1] Montgomery moved for discovery on November 25, 2005, asking to obtain video tapes of the incident and defendants' work records, among other items. Judge Urbanski denied this motion as premature, since the defendants had not yet responded to the merits of his claims.

The AUSA filed a Second Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, on December 12, 2005, arguing that Montgomery either stated no constitutional claim or presented no genuine issue of material fact.[2] On March 23 and 24, 2006, Judge Urbanski conducted a two-day evidentiary hearing on the exhaustion issue. After a four-month delay while that hearing was being transcribed, Judge Urbanski issued his Report and Recommendation on August 18, 2006, recommending that the court deny summary judgment and find in favor of Montgomery by a preponderance of the evidence on the issue of exhaustion. The defendants filed objections to the Report, submitting additional evidence in support of their exhaustion defense. Judge Kiser issued an Opinion and Order on October 30, 2006, adopting the conclusion of the Report in part; however, he declined to make credibility findings or to grant judgment for Montgomery on the exhaustion issue. Judge Kiser found genuine issues of material fact, denied summary judgment, and ordered that the matter be set for trial on that issue. Judge Urbanski issued a second Report and Recommendation ("Report II") on November 17, 2006, recommending that the defendants' Second Motion for Summary Judgment on the merits of Montgomery's excessive force claims be denied and the case should be set for a bench trial.

Judge Kiser issued an Opinion and Order on February 7, 2007, adopting the findings and recommendations of Report II in part and rejecting it in part. He

_____

[2] On December 27, Montgomery renewed his discovery requests. Judge Urbanski ordered defendants to provide copies of the video tapes to the court, but denied discovery of defendants' work records and other documents on the ground that they were not necessary for Montgomery to respond to the issues raised in the defendants' motions.

-4-

subdivided Montgomery's excessive force claim into three parts: (1) the initial use of force (rubber bullets and chemical munitions), (2) the initial decision to place Montgomery in four point restraints, (3) and the later decisions to leave him in four-point restraints for a total of eighteen hours. Judge Kiser denied summary judgment only as to part (3) against Captain Bondurant and granted summary judgment as to all other claims and defendants.[3]  At this point, the case was transferred to my docket, and I scheduled the matter to be tried on May 17, 2007.

On April 16, 2007, a month before trial, counsel filed a third Motion for Summary Judgment on defendant Bondurant's behalf.  In support of this motion, counsel produced, for the first time, work records showing that Bondurant had been on vacation on August 6 and 7, 2004, when the alleged excessive force occurred. Montgomery immediately moved for leave to amend.  I granted Montgomery leave to engage in discovery and to amend to identify the proper defendants.  *See Gordon v. Leeke*, 574 F.2d 1147, 1152-53 (4th Cir. 1978) (holding that when pro se litigant alleges colorable claim, but names improper defendants, the court should "afford him a reasonable opportunity to determine the correct person or persons against whom the claim is asserted" and allow him to amend his pleadings).  Montgomery filed an Amended Complaint on May 5, 2007.  I then granted summary judgment for

---

[3] Montgomery named Bondurant as a defendant to this claim because he believed that on August 6, 2004, Bondurant was on duty, viewed video tape footage of Montgomery's behavior while in four-point restraints, and determined that the inmate should remain restrained for additional time on August 7.  With his first Motion for Summary Judgment, Bondurant submitted an affidavit asserting that he was not at USP Lee on August 6 and 7, 2004.  Finding genuine issues of material fact in dispute, Judge Kiser denied Bondurant's Motion.

Case 7:05-cv-00131-JPJ-PMS   Document 215   Filed 09/27/08   Page 5 of 26   Pageid#: 1339

Bondurant.  Exercising the court's obligation to screen prisoner claims under 28 U.S.C.A. § 1915A (West 2006), I dismissed several portions of the Amended Complaint on July 5, 2007, for failure to state a claim, but found that the following claims survived dismissal:

A. Lieutenant Shults denied Montgomery a shower with soap after he had been pepper sprayed; when Montgomery was being placed in four points and begged to be allowed to wash off the pepper spray, Shults told him to "deal with it";

B. Lieutenant Corriveau led the officers who initially placed Montgomery in four point restraints and then told Montgomery to "deal with it" when the inmate  begged to be allowed to wash off more of the pepper spray;

C. Lieutenant Peltier forced Montgomery to endure cruel and unusual punishment in four point restraints for 18 hours; and

D. Lieutenant Lopez forced Montgomery to endure cruel and unusual punishment in four point restraints for 18 hours.

The clerk mailed Notice of Waiver of Service to these four defendants, and on October 15, 2007, counsel filed the present  Motion to Dismiss or in the Alternative, Motion for Summary Judgment.  Montgomery has responded to the Motion, making it ripe for consideration.

The defendants assert in their Motion to Dismiss that none of Montgomery's amended claims relate back to the claims in his original Complaint, pursuant to Federal Rule of Civil Procedure 15(c), and are thus barred by the applicable two-year statute of limitations.  In the alternative, defendants argue for summary judgment on the ground of qualified immunity.

-6-

II

A. STATUTE OF LIMITATIONS.

Federal civil rights actions under *Bivens*, like civil actions against state officials under 42 U.S.C.A. § 1983 (West 2003),[4] are governed by the statute of limitations for personal injuries in the state where the tortious act occurred. *See Napier v. Thirty or More Unidentified Fed. Agents*, 855 F.2d 1080, 1087-88 n.3 (3d Cir. 1988). In Virginia, *Bivens* actions fall under Virginia's two-year statute of limitations for personal injury contained in Virginia Code § 8.01-243(A) (Supp. 2008). *Blanck v. McKeen,* 707 F.2d 817, 819 (4th Cir. 1983); *Shelton v. Angelone*, 148 F. Supp. 2d 670, 677 (W.D. Va. 2001) (citing *Owens v. Okure*, 488 U.S. 235, 239-40 (1989)). A cause of action accrues and the statute of limitations begins running "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." *See Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc).

The Federal Rules of Civil Procedure recognize that amendments to a civil complaint should be permitted if they "relate back" to the original, timely filed pleadings in specific respects. Rule 15(c)(1) states:

> (1)    *When an Amendment Relates Back.* An amendment to a pleading relates back to the date of the original pleading when:
>
> (A)    the law that provides the applicable statute of limitations allows relation back;

---

[4] Courts generally apply case law interpreting constitutional claims under § 1983 to *Bivens* cases as well. *See Abella v. Rubino*, 63 F.3d 1063, 1065 (11th Cir.1995).

> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out–or attempted to be set out–in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
>> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
>>
>> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.
>
> (2) *Notice to the United States.* When the United States or a United States officer or agency is added as a defendant by amendment, the notice requirements of Rule 15(c)(1)(C)(i) and (ii) are satisfied if, during the stated period, process was delivered or mailed to the United States attorney or the United States attorney's designee, to the Attorney General of the United States, or to the officer or agency.

Fed. R. Civ. P. 15(c).[5]  An amendment changing a party to a lawsuit relates back to the date of the original, timely filed complaint under Rule 15(c)(1) when three conditions are met: (1) the amendment arises out of the same "conduct, transaction, or occurrence" as the original complaint; (2) the new party received adequate notice of the lawsuit "within the period provided by Rule 4(m) for serving the summons and

_____

[5]  Amendments to Rule 15 that took effect on December 1, 2007, reconfigured the designations assigned to the paragraphs and subsections of the Rule.  As defendants' motion was filed before the amendments, it uses the paragraph designations of the prior version of Rule 15(c).

complaint," so as to not be "prejudiced in maintaining a defense on the merits"; and (3) the new party knew or should have known that "but for a mistake concerning the identity of the proper party, the action would have been brought against the party." Fed. R. Civ. P. 15(c)(1)(C).

In the past, courts interpreting the relation-back principles of Rule 15(c) have "focused on the type of mistake involved, and whether it resulted from clerical error, lack of knowledge of the identity of the proper defendant, or strategic error or oversight." *Justus v. County of Buchanan*, 498 F. Supp.2d 883, 885 (W.D. Va. 2007). The United States Court of Appeals for the Fourth Circuit has recently held that the focus should be on enforcing defendants' right to repose as provided by a statute of limitations: "[W]hen a person would reasonably believe that the time for filing suit had expired, without having been given notice that it should have been named in an existing action, that person is entitled to repose." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 472 (4th Cir. 2007) (en banc). On the other hand,

> *[W]hen a defendant has had notice from the beginning* that the plaintiff sets up and is trying to enforce a claim against it because of specified conduct, the reasons for the statute of limitations do not exist, and . . . a liberal rule [allowing amendment] should be applied.

*Id.* at 471 (quoting *N.Y. Cent. & Hudson River R.R. v. Kinney*, 260 U.S. 340, 346 (1922)). Specifically, the *Goodman* court found that when a "party has been given fair notice of a claim . . . and will suffer no improper prejudice in defending it, the liberal amendment policies of the Federal Rules favor relation-back." *Id.*

Montgomery's original Complaint, alleging violations of his Eighth Amendment rights on August 6 and 7, 2004, was timely filed in March 2005.

Case 7:05-cv-00131-JPJ-PMS   Document 215   Filed 09/27/08   Page 9 of 26   Pageid#: 1343

Because he qualified to proceed in forma pauperis pursuant to § 1915(b), the clerk mailed process to each of the defendants, to the United States Attorney, and to the Attorney General. After defendant Bondurant submitted documentation in support of his Third Motion for Summary Judgment, indicating that he had been on vacation on August 6 and 7, 2008, the court granted Montgomery an opportunity to amend to identify other individuals as defendants. Montgomery filed his Amended Complaint on May 5, 2007. After dismissing several of the amended claims, the court directed the clerk to attempt service on the current defendants— Shults, Corriveau, Peltier, and Lopez—in July 2007. Because the amended claims against the current defendants were not filed within two years from August 6 and 7, 2004, the date on which Montgomery's injuries occurred, it is undisputed that the amended claims are untimely under § 8.01-243(A).

Thus, the question before me today is whether Montgomery's amendment adding parties relates back to his original Complaint under Rule 15(c). I find that it does.

First, Montgomery's amendment did not bring new claims against new parties; rather, it named different defendants as being responsible for the actions, as described in the original Complaint, of not fully decontaminating him and maintaining him for many hours in four-point restraints. Thus, the amended claims clearly arose from the same "conduct, transaction, or occurrence" as required under Rule 15(c)(1)(B) and changed existing parties as required under Rule 15(c)(1)(C). Second, as employees of the United States Bureau of Prisons ("BOP"), the defendants are "United States

-10-

officer[s]," subject to the provisions of Rule 15(c)(2). Under the plain language of this section, timely service of Montgomery's original Complaint on the United States Attorney constructively satisfied the notice requirements of subsections (i) and (ii) of Rule 15(c)(1)(C).

Rule 15(c)(2) eliminates the need for the amending party to prove that newly named parties had personal notice of his claims within the stated period, based on the theory that timely notice to the AUSA who represented the originally named officers is sufficient to protect the interests of the new defendants. In Montgomery's case, the theory holds true, as the AUSA has been active in defending the case since its inception. The record includes extensive and detailed evidence in support of the defense case, including video footage and contemporaneous reports concerning the events of August 6 and 7, 2004. Although Montgomery's original Complaint named other defendants to the excessive force claims and worded his legal claims against defendant Shults in a slightly different manner, the AUSA assigned to this case from the beginning has had timely notice of the issues and allegations on which Montgomery wished to recover under *Bivens* and so has had fair opportunity to prepare a defense against those claims.

Moreover, the AUSA knew or had reason to know that but for legal and factual mistakes, Montgomery would have sued the defendants named in the Amended Complaint. She knew from the original Complaint that he wished to sue the officers who told him to "deal with" the continuing pain from the pepper spray and that he alleged specific involvement by Shults and Corriveau by name. He mistakenly

-11-

believed that this claim should be brought against supervising officials and has now corrected that legal mistake by changing the wording of the claim slightly to sue Shults and Corriveau as the officers who allegedly had personal knowledge that he would suffer additional harm from the chemical munitions if he was not decontaminated more thoroughly before being maintained for a lengthy period in restraints. The AUSA also knew that absent Montgomery's mistaken understanding that Officer Bondurant made the decision to hold him in restraints for eighteen hours, he would have named as defendants the officers who, in fact, made that decision—Peltier and Lopez. The personal involvement of all four of these defendants in the events described in the original Complaint creates a strong likelihood that the AUSA would have interviewed them personally during the course of her investigation and defense of the claim for the original defendants.[6] Whether or when she actually interviewed each of the new defendants before the amendment is not a necessary element of the constructive notice theory, however, since she herself received timely notice of the claim.

Furthermore, in addressing the original Complaint, the AUSA was obligated by her professional responsibilities to prepare a complete defense to the very claims that the new defendants now face. Indeed, the record reflects that the AUSA has energetically litigated this case. She has interviewed potential witnesses, prepared affidavits, filed three dispositive motions supported by extensive documentation,

---

[6] Indeed, Shults had actual notice of the original Complaint, because he was originally named a defendant.

called and questioned witnesses during the evidentiary hearing, and filed objections to the magistrate judge's reports.

Based on the foregoing, I find that Montgomery's Amended Complaint relates back to his timely filed original Complaint. Since the defendants have had constructive notice of Montgomery's claims under Rule 15(c)(2) since the original Complaint was served on the AUSA, the claims served on them in the Amended Complaint relate back to the timely served claims and are not barred by the statute of limitations. *See Goodman,* 494 F.3d at 471 (finding that "Federal Rules favor relation back" when party has had "fair notice of a claim and will suffer no improper prejudice in defending it").

The defendants argue that Rule 15(c)(2) does not apply in *Bivens* actions, in which federal officers are sued in their individual capacities.[7] I do not find their arguments to be persuasive.

The paragraph now designated as Rule 15(c)(2) was added in 1966. The Advisory Committee Notes indicate that the purpose of this constructive notice provision was to prevent an action against officers or agencies of the United States

---

[7] The defendants argue that Rule 15(c)(2) applies only to cases in which a federal officer is sued in his official capacity. They assert that because they are sued in their individual capacities, Rule 15(c)(1)(C) governs whether or not Montgomery's amended claims against them relate back to his timely filed claims against other defendants. Specifically, they argue that the Amended Complaint does not relate back under Rule 15(c)(1)(C) because it adds new parties rather than changing parties, because the defendants did not receive notice of the amended claims within the time allowed for service of process of the original Complaint, and because the defendants would be prejudiced in defending against these claims. The defendants assert that they and their witnesses do not remember sufficiently specific details about the events in August 2004 on which Montgomery's claims are based.

-13-

from being dismissed unfairly because the plaintiff mistakenly failed to name or serve the right federal entity ("the United States or a United States officer or agency") as a defendant. The cases cited as examples in the Notes involve federal officials named as defendants in their official capacities as figureheads for a governmental agency.[8] Five years after the constructive notice provision was added to Rule 15, the Supreme Court issued the *Bivens* decision, recognizing a "judicially created damages remedy" to vindicate civil rights violations committed by federal officials. *Hall v. Clinton*, 235 F.3d 202, 204 (4th Cir. 2000) (citing *Bivens*, 403 U.S. at 395-97). In a *Bivens* action, the plaintiff sues the federal officer in his individual capacity for his personal violations of plaintiff's constitutional rights in the course of his federal employment, rather than in his official capacity as a placeholder for the United States or one of its agencies. While federal officers named as defendants in a *Bivens* action are normally represented by the United States Attorney, the plain language of Rule 15(c)(2) has never been expressly amended to exclude actions under *Bivens* from its constructive notice principles.

Neither the Supreme Court nor the Fourth Circuit has addressed the issue of whether Rule 15(c)(2) applies to *Bivens* actions. Relying on the plain language of Rule 15(c)(2) itself, other courts have held that proper and timely service of a *Bivens*

---

[8] *See, e.g., Cohn v. Fed. Sec. Admin.*, 199 F. Supp. 884, 885 (W.D.N.Y. 1961) (before addition of the constructive notice provision of Rule 15(c)(2), plaintiff seeking disability insurance under the Social Security Act erroneously sued the "Federal Security Administration," a non-existent agency, and failed to name the Secretary of Health, Education and Welfare, a necessary party; plaintiff's amendment outside statutory filing period seeking to add the Secretary as defendant was denied as an untimely new cause of action).

-14-

complaint on the United States Attorney constitutes adequate notice to individual federal officials later named as defendants in an amendment filed outside the statute of limitations period. *See Pope v. Bond*, 641 F. Supp. 489, 495 (D.D.C. 1986) (allowing amendment of *Bivens* action to bring in new federal officers as defendants past limitation period under Rule 15(c)(2)); *Johnson v. Sawyer*, 640 F. Supp. 1126, 1135 (S.D. Tex. 1986) (same); *Fludd v. U. S. Secret Serv.*, 102 F.R.D. 803, 805 (D.D.C.1984) (same); *Farmer v. State*, 788 P.2d 43, 47 (Alaska 1990) (interpreting state rule equivalent of Fed. R. Civ. P. 15(c)(2)); *see also Ish Yerushalayim v. U.S. Dep't of Corr.*, 374 F.3d 89, 92 n.2 (2d Cir. 2004) (noting that because plaintiff did not deliver or mail serve his original *Bivens* complaint on the United States Attorney or the Attorney General, he could not "take advantage of [the] rule of constructive notice" in Rule 15(c)(2) in amending to name individual federal officers as defendants outside statutory period).

Yes, there is an opposing camp in which the defendants have pitched their tent. Some courts have refused to apply the Rule 15(c)(2) constructive notice provision to late amendments in *Bivens* cases, based on interpretation of the Advisory Committee Notes from 1966, which pre-dated *Bivens* itself, on Notes regarding the 1991 amendment to Rule 15(c),[9] or on general public policy concerns. *See Delgado-Brunet v. Clark*, 93 F.3d 339, 344 (7th Cir.1996) (stating without explanation or citation that

---

[9] The 1991 amendment to Rule 15(c)(1)(C) added the language requiring that new parties must have received adequate notice of amended claims within the time allowed for service of process under Fed. R. Civ. P. 4(m). The Notes regarding the 1991 amendment concern suits against the United States. Neither the 1991 amendment nor the Notes, however, expressly excludes *Bivens* actions from the constructive notice provisions of Rule 15(c)(2).

Case 7:05-cv-00131-JPJ-PMS   Document 215   Filed 09/27/08   Page 15 of 26   Pageid#: 1349

"government notice" provision of Rule 15(c) applies only in suits against federal officers sued in official capacity); *Lojuk v. Johnson*, 853 F.2d 560, 563 (7th Cir. 1988).

In *Lojuk*, the Seventh Circuit asserted that the constructive notice provision now designated as Rule 15(c)(2)

> was added specifically to take care of situations where a person denied federal benefits did not file within the appropriate period a civil action against the federal officer denying the benefits but instead wrongly sued an improper governmental defendant. . . . No comparable situation exists here. If either Congress or the drafters of the Civil Rules had intended to wipe out the defense of the statute of limitations otherwise available to federal officers, there would certainly have been a clearer indication. Instead, the 1966 Amendment adding the [constructive notice provision of Rule 15(c)(2)] was to facilitate a citizen's suit against his sovereign by eliminating an unnecessary trap for the unwary, as well as to dispel the confusion regarding the requirement for relation back against the Government.

853 F.2d at 563 (internal quotations and citations omitted).

These cases, however, fail to respect the plain language of Rule 15(c)(2) itself, which on its face applies the constructive notice principles to federal officers with no express distinction as to the capacity in which those officers are named as defendants.

In the absence of controlling precedent from the Supreme Court or the Fourth Circuit regarding the application of Rule 15(c)(2) in a *Bivens* action, I will apply the plain language of the rule and find that timely service of the original Complaint on the United States Attorney satisfied the notice requirements of Rule 15(c)(1)(C).[10]

---

[10] Moreover, the amended claim against defendant Shults, who was one of the originally named defendants, was described in detail in the original Complaint and so clearly relates back to that Complaint under Rule 15(c)(1)(B).

-16-

I will thus deny the defendants' motion seeking dismissal on the ground that the claims are time-barred.

## B.  QUALIFIED IMMUNITY.

The defendants also argue that they are entitled to summary judgment on the ground of qualified immunity.  Law enforcement officers performing discretionary functions "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity protects law enforcement officers from bad guesses in gray areas and ensures that they are liable only for transgressing bright lines." *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006) (internal quotations omitted).  The threshold question in determining whether a law enforcement officer is entitled to qualified immunity is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the court finds that plaintiff's allegations, even if proven, would not present a constitutional violation, the analysis ends, because the plaintiff cannot prevail as a matter of law.  *See Jones v. Buchanan*, 325 F.3d 520, 526 (4th Cir. 2003). But if the court finds that the allegations do show violation of a constitutional right, I must then decide whether the contours of the right were clearly established in a "particularized" sense at the time of the violation such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 201-202.

-17-

The well established Eighth Amendment prohibition against cruel and unusual punishment as applied to allegations of excessive force has been discussed repeatedly and at length in previous reports and opinions in this case. In short, "only the unnecessary and wanton infliction of [more than de minimis] pain [on prisoners] constitutes cruel and unusual punishment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (internal quotations omitted); *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). In the context of quelling prison disturbances, force applied "maliciously and sadistically for the sole purpose of causing harm" is unconstitutional. *Stanley v. Hejirika*, 134 F.3d 629, 634 (4th Cir. 1998) (internal quotations omitted). This subjective aspect of the analysis considers factors such as the amount of force used as related to the need for force, the threat reasonably perceived by the officers, and any attempts the officers made to "temper the severity of a forceful response." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). However, if no reasonable juror could conclude from the objective evidence, taken in the light most favorable to the plaintiff, that he suffered anything more than de minimis injury, or that any force used was "repugnant to the conscience of mankind," defendants are entitled to summary judgment. *Norman v. Taylor*, 25 F.3d 1259, 1263 (4th Cir. 1994).

It was well established in the Fourth Circuit that prison officials violate the Eighth Amendment when they maintain a non-threatening inmate in restraints immobilizing his arms and legs for eight hours or more, particularly after applying a chemical deterrent. *See Williams*, 77 F.3d at 765. Even "when . . . prison administrators initially apply force in a good faith effort to maintain discipline, how

-18-

long restraint may be continued calls for the exercise of good judgment on the part of prison officials." *Id.* (internal quotations and citations omitted). The court in *Williams* specifically cautioned that while courts must afford deference to the expertise of prison administrators "to determine what is necessary for the prison's internal security," such "[d]eference to prison officials does not give them constitutional license to torture inmates." *Id.* (internal quotations omitted). "[When] the immediacy of the disturbance [i]s at an end . . . the unnecessary infliction of continued pain throughout a prolonged time period clearly supports an inference that the guards were acting to punish, rather than to quell the disturbance." *Id.* (citing *United States v. Cobb*, 905 F.2d 784, 789 (4th Cir. 1990) ("[P]unitive intent behind a defendant's use of force may be inferred when the force is not reasonably related to a legitimate non-punitive governmental objective.") (quotations omitted)). Under this precedent, in order to prove their entitlement to qualified immunity in Montgomery' case, defendants must establish that the circumstances they faced were sufficiently different from the facts of *Williams* in ways that caused them to believe that their actions did not violate Montgomery's constitutional rights.

    1. Corriveau and Shults.

    In allowing Montgomery's amended claims against Corriveau and Shults to survive screening under § 1915A, I found:

> In Claims 5 and 6 of the Amended Complaint, Montgomery sues S.I.S. Shults and Lieutenant Corriveau for knowingly allowing him to remain in restraints without alleviating the pain he was suffering from the residual effects of pepper spray. Montgomery also raised these allegations in his original Complaint. Judge Kiser found Montgomery's evidence insufficient to prove that he suffered ill effects from the pepper

-19-

spray for the entire eighteen hours of the restraint period, but at the same time, recognized the painful burning initially caused by the spray. Defendants' evidence indicates that the effects of pepper spray dissipate "quickly," but does not offer any time estimate. Montgomery may be able to prove that because Shults and Corriveau took insufficient action to get Montgomery fully decontaminated after he complained to them as he was being restrained, the pain from the pepper spray continued at a more than *de minimis* level during a portion of the restraint period when he was held in violation of the Eighth Amendment.[11]

(Opinion, Dkt. No. 173, July 5, 2007, at p. 9) (footnote in original). Defendants now submit an affidavit from David Allred, D.O., Clinical Director at USP Lee. Dr. Allred states that because pepper spray is biodigradeable, it requires minimal washing for dissipation, and that its effects generally dissipate within 45 minutes even when the inmate receives no decontamination. He offers his professional opinion that because pepper spray dissipates quickly, decontamination is not medically necessary.

Corriveau and Shults first argue that the claims against them should be dismissed, because Montgomery's allegations fail to state a claim that their actions wantonly caused him pain past the initial application of the restraints. This defense is not well taken, as I have already ruled that Montgomery's allegations, viewed in the light most favorable to him, do state such a claim. (Opinion, July 5, 2007, at 9-10). This finding also satisfies the threshold question of the qualified immunity analysis under *Saucier*, 533 U.S. at 200-201. Thus, I must move on to the second

---

[11] Montgomery does not allege facts suggesting that these defendants played any role in the decision to continue him in restraints, and the record indicates that they did not. Thus, Montgomery's claim here is limited to the officers' failure to get him fully decontaminated before he was left for a long period to suffer the effects of the pepper spray while in restraints.

-20-

inquiry—in light of existing case law from the Supreme Court or the Fourth Circuit, would a reasonable officer have believed that his conduct was lawful?

In this section of their argument, defendants rely heavily on the facts of *Williams*, 77 F.3d at 759-60. Williams, a South Carolina inmate, was housed in a segregation unit when he and five other inmates protested a correctional officer's verbal threats to a fellow inmate by throwing water out of their cells' food service windows. The officer ordered the inmates to stop throwing water and then ordered Williams to get his arm out of the food service window. Williams asked, "Why?" and on the officer's order, Williams was sprayed in the chest and face with mace. Williams stopped misbehaving, complained of the pain from the mace, and begged for a shower. The officer refused and turned off the water to Williams's cell. A short time later, officers removed the mattress from Williams's bed and secured him in four-point restraints, on his back, to his metal bed frame. The officers allegedly did not respond to Williams's continued pleas for medical attention and a shower because the mace was burning his skin and eyes and left him in the restraints for eight hours without a break.

Shults and Corriveau argue that their circumstances in this case are distinguishable from the facts of the *Williams* case. The defendants in the *Williams* case refused to allow Williams to wash the mace off his skin or flush it out of his eyes, in violation of BOP policy and despite his "'hollering with pain'" from the burning of the mace. *Id.* at 764. It is undisputed, on the other hand, that Montgomery was allowed to shower briefly and had his eyes rinsed with saline a few times before

-21-

being restrained. Williams alleged that no medical personnel checked on his condition. *Id.* at 765. The video tapes in the Montgomery case file establish that medical staff checked each inmate's condition immediately after he was cuffed and shackled in the recreation yard, once the chemical munitions had ceased. The defendants in Montgomery's case also offer evidence that according to prison policy, medical officers check an inmate's condition at regular intervals while he is restrained, an officer monitors the inmate every fifteen minutes, and a lieutenant monitors the inmate every two hours.[12]

I find that a reasonable officer, under the circumstances Shults and Corriveau faced, would reasonably believe that the steps taken to ameliorate the effects of the pepper spray before leaving Montgomery in restraints were sufficient to avoid the constitutional violations noted in the *Williams* case. Given the efforts to wash off the pepper spray and flush the eyes, along with defendants' evidence that the effects of pepper spray normally dissipate within forty-five minutes, Shults and Corriveau had reason to believe that the painful effects of the chemical were already lessened to some extent when Montgomery was restrained and would soon improve by the normal dissipation of the substance over time.[13] Moreover, these defendants

---

[12] Prison records indicate that on August 6, 2004, a nurse visited Montgomery's cell to check for any medical needs at 5:20 p.m. (two hours after he was placed in restraints), 8:00 p.m., 12:00 a.m, 8:00 a.m., 12:00 p.m., and at his release on the afternoon of August 7, 2004. Whether these nurses actually checked Montgomery's condition or provided any treatment is irrelevant to the court's determination of what Shults and Corriveau reasonably believed would happen after they left Montgomery in restraints.

[13] It is undisputed that before Montgomery was placed in four point restraints a nurse applied saline to his eyes four times and examined the wounds apparently inflicted by the pepper ball munitions. Non-medical officers such as Shults and Corriveau can rightfully rely

-22-

reasonably believed that if the pain continued at a significant level, Montgomery would report the problem, and one of the medical staff members or other officers monitoring his condition during the restraint period would recognize the problem and take further ameliorative measures if necessary. Because a reasonable officer would have believed from the circumstances and controlling case law that his actions were lawful, I find that Shults and Corriveau are entitled to qualified immunity against Montgomery's claims and will grant summary judgment for them on that ground.

    2. Peltier and Lopez.

These defendants assert that they are entitled to qualified immunity because they reasonably believed that restraining Montgomery for eighteen hours was necessary in a good faith effort to restore order after the inmates' protest actions. In support of this "reasonable belief" argument, they submit copies of logged reports (from other officers doing fifteen minute checks and from their own notes) indicating that for the majority of the time he spend in restraints, Montgomery "continued to act combatively and threatened prison officials." They also present documentation of his institutional history of gang affiliation and disciplinary infractions. They argue that if a court were to hold that their stated perception of Montgomery as a continued

---

on a medical official's decision as to the appropriate course of treatment for an inmate's medical need. *Miltier v. Beorn*, 896 F.2d 848, 855 (4th Cir. 1990).

     Montgomery asserts that Shults and Corriveau could not reasonably have believed that the effects of the pepper ball munitions used against him could be alleviated in the same manner as the effects of simple pepper spray, particularly when his entire body was covered with the substance. He does not convince me, however, that this distinction between the effects of different chemical products, assuming that he can prove its existence, was obvious enough to non-medical staff so as to change the qualified immunity analysis for Shults or Corriveau.

threat did not justify continued use of restraints, the court would "have to supplant its judgment for that of the prison officials" who viewed Montgomery's behavior. (Mot. Summ. J., Oct. 15, 2007, at 30).

The defendants' argument holds water only in a case where no genuine dispute exists over the facts undergirding the defendants' stated perceptions. *See, e.g., Rainey v. Conerly*, 973 F.2d 321, 324 (4th Cir.1992) (finding that district court properly denied defendant's immunity-based summary judgment motion because "a determination of what actually happened is absolutely necessary to decide whether [defendant] could reasonably have believed that his actions were lawful"); *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991) (finding summary judgment precluded where resolution of claim depends on credibility determination). These defendants have no such case. Material facts remain in dispute as to Montgomery's behavior in restraints. He denies that he made any threatening comments or gestures during this time. I find, as did Judge Kiser,[14] that Montgomery's evidence could persuade a reasonable jury that he made no threatening gestures or verbal threats while restrained and that Peltier and Lopez maintained him and the other inmates in restraints for eighteen hours out of malice to punish rather than in a good faith effort to "quell the disturbance." *Williams*, 77 F.3d at 765. I also find a genuine issue of material fact

---

[14]    Judge Kiser denied summary judgment for the previous defendants on this argument. Specifically, he noted that Montgomery denies threatening anyone while he was in restraints, that video footage is not inconsistent with his version of events, and that release of all the inmates at the same time supports an inference of an arbitrary release time. He thus found a genuine issue of material fact as to the officers' subjective purposes in maintaining Montgomery's restraints for such a long time. (Opinion, Feb. 7, 2007, at 12). He also found a genuine issue of material fact in dispute as to whether Montgomery suffered more than de minimis injury. *Id.* at 15.

-24-

as to whether Montgomery's injury from the lengthy restraint period was more than de minimis or otherwise "repugnant to the conscience of mankind." *Norman*, 25 F.3d at 1263. Until a jury decides who to believe on the issue of Montgomery's behavior and level of suffering during the restraint period, no one can decide whether Peltier and Corriveau (or any reasonable officer in the same circumstances) could reasonably have believed that holding him in restraints for eighteen hours did not violate his constitutional rights. Therefore, I cannot find that Peltier or Lopez are entitled to summary judgment on the ground of qualified immunity. For the same reasons, I also cannot find that they are entitled to summary judgment on the merits of Montgomery's excessive force claims. Accordingly, I will deny their Motion for Summary Judgment and set the case for trial before a jury.

## III

For the reasons stated, it is **ORDERED** as follows:

1. Defendants' Motion to Dismiss is DENIED;

2. Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part;

3. Judgment is GRANTED to Defendants Shults and Corriveau on the ground of qualified immunity, but DENIED to Defendants Peltier and Lopez; and

4. The case shall be set for trial against Defendants Peltier and Lopez .

-25-

ENTER: September 27, 2008

/s/ JAMES P. JONES
Chief United States District Judge