IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **MICHAEL E. MONTGOMERY,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Case No. 7:05-cv-00131** |
| ) | |
| **SIA JOHNSON, et. al.,** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |

## SECOND AMENDED COMPLAINT

Plaintiff Michael E. Montgomery through undersigned counsel, files this Amended Complaint against Defendants Warden Bryan Bledsoe, Lieutenant Deborah Peltier, Lieutenant Carlos Lopez, Lieutenant David Grieve, and Lieutenant Glenn Friss (collectively "Defendants").

## NATURE OF THE ACTION

1.  Michael E. Montgomery ("Montgomery") brings this action for damages based on the cruel and unusual punishment he suffered while incarcerated at the Federal Bureau of Prisons ("BOP") United States Penitentiary in Jonesville, Virginia ("USP Lee"). At USP Lee, Defendants kept Montgomery chained to a bed with both his arms and his legs in restraints for nearly 19 hours without food, drink or a break to relieve himself. Defendants then placed Montgomery in steel wrist and ankle cuffs that were tightly bound by chains to his waist for nearly 30 hours—again without a break for food, drink or to relieve himself. This treatment, in addition to being inhumane and in violation of Bureau of Prison policy, constitutes cruel and unusual punishment in violation of the Eighth Amendment of the Constitution of the United States.

**PARTIES**

2.      Montgomery is a prisoner in custody of the BOP and was, at all times relevant to this matter, a prisoner in the custody of the BOP incarcerated at USP Lee.  Montgomery is currently incarcerated at FCI Petersburg, located in Petersburg, Virginia.

3.      Defendant Warden Bryan Bledsoe ("Warden Bledsoe") was at all times relevant to the allegations herein the Warden of USP Lee.  Defendant Warden Bledsoe is currently employed as the Warden at USP Lewisburg in Lewisburg, Pennsylvania.  This lawsuit is being brought against Warden Bledsoe in his personal capacity.

4.      Defendant Deborah Peltier ("Lieutenant Peltier") was at all times relevant to the allegations herein a BOP Corrections Officer with the rank of Lieutenant at USP Lee.  This lawsuit is brought against Lieutenant Peltier in her personal capacity.

5.      Defendant Carlos Lopez ("Lieutenant Lopez") was at all times relevant to the allegations herein a BOP Corrections Officer with the rank of Lieutenant at USP Lee.  Lieutenant Lopez is currently employed as a Training Instructor for the Federal Law Enforcement Training Center in Glynco, Georgia.  This lawsuit is brought against Lieutenant Lopez in his personal capacity.

6.      Defendant David Grieve ("Lieutenant Grieve") was at all times relevant to the allegations herein a BOP Corrections Officer with the rank of Lieutenant at USP Lee.  Lieutenant Grieve is currently employed as a Lieutenant at FCI La Tuna in Anthony, Texas.  This lawsuit is brought against Lieutenant Grieve in his personal capacity.

7. Defendant Glenn Friss ("Lieutenant Friss") was at all times relevant to the allegations herein a BOP Corrections Officer with the rank of Lieutenant at USP Lee. This lawsuit is brought against Lieutenant Friss in his personal capacity.

**JURISDICTION & VENUE**

8. This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331. This action arises under the U.S. Supreme Court decision *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

9. The Western District of Virginia is a proper venue under 28 U.S.C. § 1391(b).

**FACTUAL ALLEGATIONS UNDERLYING THE COMPLAINT**

10. In August 2004, Montgomery was housed in the Special Housing Unit ("SHU") at USP Lee.

11. At the SHU at USP Lee, inmates are housed two to a cell. Inmates spend 23 hours a day in their cell, and are only moved from the cell for a one-hour period when they are placed in the "recreation cage."

12. On August 6, 2004, Montgomery and three other inmates staged a peaceful protest in the recreation cage of the SHU during their one-hour recreation period. Montgomery and the other inmates were protesting their treatment while in the SHU. Specifically, the inmates housed in the SHU, and Montgomery in particular, were not receiving their incoming mail on a timely basis, their unit teams did not visit them on a regular basis, they were not given consistent

recreational periods, and they were not given basic personal hygiene items such as toothbrushes, toothpaste, soap, clean clothes or items to clean their cells.

13. On August 4, 2004, when Montgomery and the other inmates were asked, at the end of their one hour in the recreation cage in the SHU, to submit to hand restraints to return to their cells from the recreation cage, Montgomery and the other inmates refused to submit to restraints until they were granted the opportunity to speak to Special Investigations Agent ("SIA") William Johnson. SIA Johnson came to speak to the inmates and Montgomery explained to SIA Johnson why they were protesting their treatment in the SHU. After initially telling Montgomery that his mail was not being withheld, SIA Johnson admitted that Montgomery's mail was being flagged as part of USP Lee's mail monitoring program.

14. A short time after SIA Johnson came to talk to the inmates, Warden Bledsoe directly approved the use of chemical munitions and a use of force team to remove the inmates forcefully from the recreation cage. Thereafter, a use of force team, fully equipped with body armor and riot gear, descended upon the outside of the recreation cage. Lieutenant Shults then began shooting, at the inmates in the recreation cage, from almost point blank range, with a variety of chemical munitions. Specifically, Lt. Shults shot the inmates in the recreation cage with Oleoresin Capsicum (i.e., pepper spray) using a Projecto-Jet Dispenser. He then shot the inmates in the recreation cage with a Pepper Ball Launcher loaded with pepper balls. He continued by shooting an extremely powerful gun, the L-8 stun gun loaded with 60 caliber sting ball projectiles.

15.     Montgomery was hit and fully contaminated by the pepper spray and hit with, and injured by, the multiple rounds from the pepper ball weapons. He suffered numerous open wounds and abrasions on his side and back from the pepper balls.

16.     After being fully contaminated by the pepper spray and hit with multiple rounds from the pepper ball weapons, Montgomery fully complied with the request to lay down on the concrete floor in the recreation cage and fully complied with prison staffs' requests to submit to hand cuffs and leg irons. At no time after prison staff entered the recreation cage did Montgomery resist, impede or threaten prison staff.

17.     Montgomery was then taken from the recreation cage tightly bound in handcuffs and leg irons. Montgomery was clearly in severe distress from the effects of the Oleoresin Capsicum, as is shown from the video record made by the prison staff. Montgomery is in respiratory distress, mucous is running profusely from his nose, and he complains repeatedly about the effects of the pepper spray on his exposed skin.

18.     A nurse briefly rinsed Montgomery's eyes, which were burning intensely and painfully from the variety of chemical munitions sprayed on him and shot at him in the recreation cage, a couple of times with saline. Montgomery was then brought into a cell in the SHU, where a member of the prison staff cut off his shirt and put his face under the shower for less than one minute. On the video record made by prison staff, when Montgomery's shirt is cut from his back, multiple wounds are clearly visible from Montgomery being shot at from close range and hit repeatedly by the chemical munitions.

19.     Montgomery was then chained to the bottom bunk of a bunk bed with his back down on the mattress. His back was covered with open wounds from the chemical munitions shot into the

5

recreation cage. His open wounds and his eyes were burning intensely from the chemicals and Montgomery was writhing in pain. Montgomery begged prison staff to help him by washing him off or pouring water over him to help lessen the pain. Prison staff refused.

20. Montgomery's arms and legs were then chained to the bed with a restraint tying each one of his limbs to a corner of the bed. The BOP commonly refers to this type of inmate chaining as "four point restraints." When used in this fashion, the chains did not allow Montgomery any meaningful range of motion, either for his extremities or his central body. Montgomery was chained to his bunk in the same boxer shorts that he was wearing in the recreation cage, which were contaminated from the chemical munitions and now wet from his time under the shower.

21. Based on the video record made by USP Lee staff, Warden Bledsoe personally and directly approved the use of restraints on Montgomery.

22. Montgomery was left chained to the bed in this manner for over 19 hours. During this time, he was not given food, not given water, and was not given any opportunity to relieve himself either by using a urinal or a toilet. Ultimately, Montgomery was forced to urinate on himself.

23. During his time chained to the bed, Montgomery's open wounds continued to burn. This burning was made even worse when prison staff cut off the air conditioning into the cell, which made him sweat and made his wounds stick to the back of the bed and open back up any time Montgomery tried to re-adjust his body with the little range of motion he had.

24.     At no time did Montgomery threaten prison staff while being chain to the bed. Rather, Montgomery was calm and compliant with all orders and did not present a threat to himself or others.

25.     After 19 hours of being chained to a bed, Montgomery was taken out of the restraints that bound his wrists and ankles to the bed and was immediately placed into another type of chaining method that bound Montgomery's wrists together and his ankles together, and then connected these chains with another chain that circled his body. The chaining components consisted of steel wrist shackles, which ran through a black steel box on a waist chain, which was in turn chained to a set of steel ankle shackles. These restraints, referred to as "ambulatory restraints" by the BOP, are designed for short-term application. Montgomery was held in ambulatory restraints for nearly 30 hours.

26.     Montgomery requested clean clothing and bedding while being moved into these restraints from Defendant Peltier but no one ever brought them to him. Rather, he stayed in the same shorts he had been in the recreational cage when the chemical munitions were shot and was left with the same bedding that he had urinated on while in four-point restraints.

27.     The chains connecting Montgomery's wrist and ankle shackles to the black box on his waist chain were so short that Montgomery could not straighten or stretch his body—a fact made even more painful given that Montgomery's arms and legs had just been shackled to a bed for over 19 hours. The wrist and ankle shackles were so restrictive that Montgomery could not use the toilet or feed himself, even if prison staff had placed food in his hands—which they did not.

28.     While in the wrist and ankle shackles, Montgomery was not offered food, drink, or the opportunity to relieve himself.

7

29.     At no time did Montgomery threaten prison staff while in the wrist and ankle shackles. Rather Montgomery was calm and compliant with all orders and did not present at threat to himself or others.

30.     Because the excessive use of force presents a serious risk of harm to an inmate, the BOP strictly prohibits the use of force, such as the placement of inmates in restraints, except under specific circumstances.  *See* BOP Program Statement ("P.S.") 5566.05.

31.     Prison staff may only use force if it is "necessary to gain control of an inmate who appears to be dangerous because the inmate:  (a) assaults another individual; (b) destroys government property; (c) attempts suicide; (d) inflicts injury upon self; or (e) becomes violent or displays signs of imminent violence."  *Id.* ¶ 1.

32.     BOP regulations state that under no circumstances may one of the chaining methods be used to punish inmates.  *Id.* ¶ 6.h(1).

33.     BOP regulations state that prison staff may temporarily apply one of the chaining methods to an inmate when the use of restraint requirements are met; however, the Warden or designee must decide whether the use of the chaining method should continue.  *Id.*¶ 6.d.

34.     If one of the chaining methods are used, BOP policy mandates that the least restrictive chaining method be used that is necessary to for the situation.  *Id.* ¶ 9.  Specifically, "ambulatory restraints" (i.e. hand cuffs, leg irons and a belly chain) should initially be used if possible, *id.*, and "four point restraints" (i.e. chaining an inmate to the bed at his wrists and ankles) should used if they are the only means available to obtain and maintain control over an inmate, *id.* ¶ 10. The Warden is the only official at the prison who can decide that the chaining restraint known as

"four point restraints" should be used and this duty cannot be delegated below the Warden's level. *Id.* at ¶ 10.a.

35. When an inmate is restrained for longer than eight hours, BOP regulations require that the Warden, the Warden's designee, or the Institutional Administrative Duty Officer must notify the BOP's Regional Director or Regional Duty Officer. *Id.* ¶ 9.

36. When an inmate is chained using the "four point restraint" method, a review of that inmate's chaining in four point restraints must be made by a Lieutenant every two hours to determine if the chaining has had the required calming effect and so that the inmate may be released from the chaining method as soon as possible. *Id.* ¶ 10.e.

37. According a senior BOP official responsible for training new officers, "inmates can be left in restraints in their cells only so long as they are combative, [and] a lieutenant has to check on the restrained inmates every two hours to determine if they are still physically combative," Supplemental Report on September 11 Detainees' Allegations of Abuse at the Metropolitan Detention Center in Brooklyn, New York, Officer of the Inspector General, DOJ, December 2003 at 23 ("Supplemental Report").

38. As soon as an officer "determines the inmate has regained physical control and is no longer a threat to himself, other inmates, or property, his restraints must be removed, [and] staff members violate BOP policy if they keep inmates restrained longer than necessary, or if they restrain inmates to punish or discipline them." *Id.* at 23-24.

39. Under BOP policy, all "use of force incidents must be reported and investigated . . . to eliminate the unwarranted use of force." P.S. 5566.05 ¶ 6.j.

40. In addition, prison staff must report the use of force directly to the Assistant Director, Correctional Programs Division, Assistant Director, Health Services Division; Central Office Correctional Services Administrator; Regional Director; and the Regional Correctional Administrator. *Id.* ¶ 15.a.

41. These reporting protocols ensure that BOP management, from prison staff to the Warden to the Director of the BOP, participates in the decision-making and monitoring process on the use of force and that prison staff does not inappropriately use force on inmates.

## COUNT I - WARDEN BRYAN BELDSOE

**EIGHTH AMENDMENT VIOLATION PURSUANT TO *BIVENS v. SIX UNKNOWN NAMED AGENTS OF FEDERAL BUREAU OF NARCOTICS*,**
403 U.S. 388 (1971).

42. Montgomery incorporates by reference the allegations of paragraphs 1 through 41, above, as though fully set forth herein.

43. On August 6, 2004, Defendant Beldsoe authorized the use of four-point restraints on Montgomery.

44. Defendant Bledsoe knew of the serious risks that restraints present to an inmate's health and safety, including the possibility of serious injury, and even death.

45. Defendant Bledsoe knew of, disregarded, and was recklessly and callously indifferent to the serious risk of harm and actual harm suffered by Montgomery from being shackled to a bed for 19 hours and from being placed in hand and ankle restraints for almost 30 additional hours.

46. Defendant Bledsoe had the obligation under BOP Policy to report Montgomery's continued restraint to the Regional Office.

47. Defendant Bledsoe had the authority to order Montgomery released from restraints.

48. Defendant Bledsoe deprived Montgomery of his right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution when he allowed Montgomery to be put in restraints for over 48 hours.

49. Montgomery suffered and continues to suffer pain, injury, and mental anguish caused by this unjustified and deliberately cruel punishment.

## COUNT II - DEBORAH PELTIER

**EIGHTH AMENDMENT VIOLATION PURSUANT TO *BIVENS v. SIX UNKNOWN NAMED AGENTS OF FEDERAL BUREAU OF NARCOTICS*,**
403 U.S. 388 (1971).

50. Montgomery incorporates by reference the allegations of paragraphs 1 through 41, above, as though fully set forth herein.

51. Defendant Peltier was responsible for performing two-hour checks on Montgomery to determine whether he should continue to be in four-point restraints.

52. Defendant Peltier was responsible for performing two-hour checks on Montgomery to determine whether he should continue to be in ambulatory restraints.

53. Defendant Peltier knew of the serious risks that restraints present to an inmate's health and safety, including the possibility of serious injury, and even death.

54. Defendant Peltier knew of, disregarded, and was recklessly and callously indifferent to the serious risk of harm and actual harm suffered by Montgomery from being shackled to a bed for 19 hours and from being placed in hand and ankle restraints for almost 30 additional hours.

55. Defendant Peltier unnecessarily continued to keep Montgomery in restraints and ignored Montgomery's compliance and nonviolent behavior while he was kept in restraints, for hours, and then days.

56. The only legitimate penological purpose for the use of full restraints on an inmate confined in a cell is to gain physical control of that inmate.

57. Defendant Peltier kept Montgomery in restraints well beyond the time the restraints became unnecessary to serve the legitimate penological purpose of physically controlling Montgomery.

58. Defendant Peltier kept Montgomery in restraints to punish him.

59. Defendant Peltier kept Montgomery in restraints in gross disregard of the serious risk of harm that the restraints presented to him.

60. Defendant Peltier was authorized to release Montgomery from restraints. But she told Montgomery that she did not know when he would be let out of restraints.

61. Defendant Peltier deprived Montgomery of his right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

62. Montgomery suffered and continues to suffer pain, injury, and mental anguish caused by this unjustified and deliberately cruel punishment.

## COUNT III - CARLOS LOPEZ

**EIGHTH AMENDMENT VIOLATION PURSUANT TO *BIVENS v. SIX UNKNOWN NAMED AGENTS OF FEDERAL BUREAU OF NARCOTICS*,**
403 U.S. 388 (1971).

63. Montgomery incorporates by reference the allegations of paragraphs 1 through 41, above, as though fully set forth herein.

64. Defendant Lopez was responsible for performing two-hour checks on Montgomery to determine whether he should continue to be in four-point restraints.

65. Defendant Lopez was responsible for performing two-hour checks on Montgomery to determine whether he should continue to be in ambulatory restraints.

66. Defendant Lopez knew of the serious risks that restraints present to an inmate's health and safety, including the possibility of serious injury, and even death.

67. Defendant Lopez knew of, disregarded, and was recklessly and callously indifferent to the serious risk of harm and actual harm suffered by Montgomery from being shackled to a bed for 19 hours and from being placed in hand and ankle restraints for nearly 30 additional hours.

68. Defendant Lopez unnecessarily continued to keep Montgomery in restraints and ignored Montgomery's compliance and nonviolent behavior while he was kept in restraints, for hours, and then days.

69. The only legitimate penological purpose for the use of full restraints on an inmate confined in a cell is to gain physical control of that inmate.

70. Defendant Lopez kept Montgomery in restraints well beyond the time the restraints became unnecessary to serve the legitimate penological purpose of physically controlling Montgomery.

71. Defendant Lopez kept Montgomery in restraints to punish him.

72. Defendant Lopez kept Montgomery in restraints in gross disregard of the serious risk of harm that the restraints presented to him.

73. Defendant Lopez had the authority to release Montgomery from restraints.

74. Defendant Lopez deprived Montgomery of his right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

75. Montgomery suffered and continues to suffer pain, injury, and mental anguish caused by this unjustified and deliberately cruel punishment.

## COUNT IV - DAVID GRIEVE

### EIGHTH AMENDMENT VIOLATION PURSUANT TO *BIVENS v. SIX UNKNOWN NAMED AGENTS OF FEDERAL BUREAU OF NARCOTICS*, 403 U.S. 388 (1971).

76. Montgomery incorporates by reference the allegations of paragraphs 1 through 41, above, as though fully set forth herein.

77. Defendant Grieve was responsible for performing two-hour checks on Montgomery to determine whether he should continue to be in four-point restraints.

78. Defendant Grieve knew of the serious risks that restraints present to an inmate's health and safety, including the possibility of serious injury, and even death.

79. Defendant Grieve knew of, disregarded, and was recklessly and callously indifferent to the serious risk of harm and actual harm suffered by Montgomery from being shackled to a bed for 19 hours and from being placed in hand and ankle restraints for nearly 30 additional hours.

80. Defendant Grieve unnecessarily continued to keep Montgomery in restraints and ignored Montgomery's compliance and nonviolent behavior while he was kept in restraints.

81. The only legitimate penological purpose for the use of full restraints on an inmate confined in a cell is to gain physical control of that inmate.

82. Defendant Grieve kept Montgomery in restraints well beyond the time the restraints became unnecessary to serve the legitimate penological purpose of physically controlling Montgomery.

83. Defendant Grieve kept Montgomery in restraints to punish him.

84. Defendant Grieve kept Montgomery in restraints in gross disregard of the serious risk of harm that the restraints presented to him.

85. Defendant Grieve had the authority to release Montgomery from restraints.

14

86.     Defendant Grieve deprived Montgomery of his right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

87.     Montgomery suffered and continues to suffer pain, injury, and mental anguish caused by this unjustified and deliberately cruel punishment.

### COUNT V - GLENN FRISS

**EIGHTH AMENDMENT VIOLATION PURSUANT TO *BIVENS v. SIX UNKNOWN NAMED AGENTS OF FEDERAL BUREAU OF NARCOTICS*,**
403 U.S. 388 (1971).

88.     Montgomery incorporates by reference the allegations of paragraphs 1 through 41, above, as though fully set forth herein.

89.     Defendant Friss was responsible for performing two-hour checks on Montgomery to determine whether he should continue to be in ambulatory restraints.

90.     Defendant Friss knew of the serious risks that restraints present to an inmate's health and safety, including the possibility of serious injury, and even death.

91.     Defendant Friss knew of, disregarded, and was recklessly and callously indifferent to the serious risk of harm and actual harm suffered by Montgomery from being shackled to a bed for 19 hours and from being placed in hand and ankle restraints for nearly 30 additional hours.

92.     Defendant Friss unnecessarily continued to keep Montgomery in restraints and ignored Montgomery's compliance and nonviolent behavior while he was kept in restraints.

93.     The only legitimate penological purpose for the use of full restraints on an inmate confined in a cell is to gain physical control of that inmate.

94.     Defendant Friss kept Montgomery in restraints well beyond the time the restraints became unnecessary to serve the legitimate penological purpose of physically controlling Montgomery.

95. Defendant Friss kept Montgomery in restraints to punish him.

96. Defendant Friss kept Montgomery in restraints in gross disregard of the serious risk of harm that the restraints presented to him.

97. Defendant Friss had the authority to release Montgomery from restraints.

98. Defendant Friss deprived Montgomery of his right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

99. Montgomery suffered and continues to suffer pain, injury, and mental anguish caused by this unjustified and deliberately cruel punishment.

## PRAYER FOR RELIEF

WHEREFORE, Montgomery demands judgment against Defendants as follows:

1. A judgment for compensatory damages as to Counts I, II, III, IV and V.

2. A judgment for punitive damages as to Counts I, II, III, IV and V.

3. The costs of this suit, including reasonable attorneys' fees; and

4. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

    MICHAEL E. MONTGOMERY

    /s/ Carrie B. Freed
    Lonnie D. Nunley, III (VSB No. 25366)
    Carrie B. Freed (VSB No. 70824)
    Dustin M. Paul (VSB No. 75287)
    Attorneys for Michael E. Montgomery
    HUNTON & WILLIAMS LLP
    Riverfront Plaza, East Tower
    951 East Byrd Street
    Richmond, Virginia 23219-4074
    (804) 788-8200 (telephone)
    (804) 788-8218 (facsimile)
    cnunley@hunton.com
    cfreed@hunton.com
    dpaul@hunton.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2009, I electronically filed the foregoing SECOND AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

>Sara Bugbee Winn
>UNITED STATES ATTORNEYS OFFICE
>P.O. Box 1709
>Roanoke, Virginia 24008-1709
>sara.winn@usdoj.gov

>and

>Anthony P. Giorno
>UNITED STATES ATTORNEYS OFFICE
>P.O. Box 1709
>Roanoke, Virginia 24008-1709
>anthony.giorno@usdoj.gov

>/s/ Carrie B. Freed
>Carrie B. Freed