IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

|  |  |  |
|---|---|---|
| MICHAEL EUGENE MONTGOMERY,<br>　　　　　Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 7:05-CV-00131 |
| SIA JOHNSON, et al.,<br>　　　　　Defendants. | ) ) ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

　　　　Defendants Deborah Peltier, Carlos Lopez, Bryan Bledsoe, Glenn Friss, and David Grieve submit this brief in support of their motion for summary judgment.

　　　　As to Warden Bledsoe, Plaintiff's Second Amended Complaint, only alleges acts for which Warden Bledsoe is entitled to qualified immunity, fails to allege facts indicating that the acts attributed to Warden Bledsoe were done for the purpose of causing Plaintiff harm, and fails to allege facts indicating that any injury Plaintiff suffered from the acts alleged committed by Warden Bledsoe was sufficiently serious.  For these reasons, the Second Amended Complaint against Warden Bledsoe should be dismissed.

　　　　Alternatively, the undisputed facts developed during discovery confirms that Warden Bledsoe is entitled to qualified immunity for the acts alleged in the Second Amended Complaint, that Warden Bledsoe committed such acts as are alleged in the Second Amended Complaint to maintain order and control over Plaintiff and his cohorts, and not for the purpose of causing harm, and that Plaintiff suffered insufficient injury from the alleged acts.

In addition, the claims in the Second Amended Complaint against Defendants Peltier and Lopez concerning ambulatory restraints, and all of the claims against Defendants Bledsoe, Grieve and Friss are barred by the statute of limitations because the claims arose more than two years ago.

## STATEMENT OF FACTS

Plaintiff's allegations against Warden Bledsoe are stated in Count I of the Second Amended Complaint, ¶¶ 21 and 42-49.  In sum and substance, the only conduct Plaintiff alleges that Warden Bledsoe committed to violate his Eighth Amendment right to be free from cruel and unusual punishment consist of:

(1) Authorizing the use of four-point restraints on plaintiff following the recreation cage disturbance on August 6, 2004; and

(2) Allowing plaintiff to remain in restraints for over 48 hours.

On August 6, 2004, Plaintiff was an inmate at the United States Penitentiary in Lee County, Virginia, ("USP Lee"), and the recognized leader of the Dirty White Boys gang. Defendant's Exhibit ("DX") 10, Plaintiff's Answers to Second Requests for Admissions No. 29. He and three other inmates, acting in concert and by agreement, refused to submit to hand restraints for movement back to their cells in the Special Housing Unit ("SHU").  DX10, Plaintiff's Answers to Second Requests for Admissions No. 39; DX1[1], DVD of Video Evidence, File: Complete Videos/Attachment 1G.mpg.  They obstructed entry to the recreation cage by tying off the door at the top and bottom, (DX10, Plaintiff's Responses to Defendants' Second Requests for Admissions No. 38; DX2[2], File:Video Excerpts/1I – 030213-030300.mpg), and tied

---

[1] DX1 is a DVD containing the entirety of videos 1G, 1H, 1I, and SHU Still Cam 1, 2 and 3.
[2] DX 2 through 7 are six video clips contained on a DVD as follows: (DX2) 1I – 030213-030300.mpg; (DX3) 1I – 030836-030915.mpg;  (DX4) 1G – 021122-021129.mpg; (DX5) 1G – 021220-021251.mpg; (DX6) 1H – 022718-022847.mpg; and (DX7) 1I – 031010-031500.mpg.

a sheet to the fence immediately above the entrance.  DX3 File:Video Excerpts/1I – 030836-030915.mpg.  Warden Bledsoe watched the group disturbance "live time" from stationary camera video feed.  DX9, Deposition of Warden Bledsoe p. 145.  The footage that Warden Bledsoe viewed is submitted in DX1 as SHU Still Cam 1-3.

Several members of USP Lee staff engaged in "confrontation avoidance" and spoke to Plaintiff and the other inmates in an effort to obtain a peaceful end to their resistance and noncompliance.  At one point during confrontation avoidance Plaintiff told the staff member, "I'm telling you this is the beginning . . . ."   DX4, File: Video Excerpts/1G – 021122-021129.mpg.  Plaintiff huddled with the other three inmates for discussion, clearly showing that the inmates acted in concert.  DX5, File: Video Excerpts/1G – 021220-021251.mpg.

At the end of what became the last confrontation avoidance effort, Plaintiff, acting as spokesperson, gathered the other three inmates for a meeting and then delivered the group's response that they were not coming out voluntarily.  DX6, File: Video Excerpts/1H – 022718-022847.mpg.

When confrontation avoidance failed, Warden Bledsoe authorized the use of force, including chemical munitions and multiple "use of force teams."  DX8, Bledsoe Declaration, at ¶5.  Consistant with BOP policy, only the Warden could authorize use of chemical munitions in this situation.  DX12, Program Statement 5566.05, July 26, 1996, Use of Force and Application of Restraints on Inmates, § 11.   Even after the use of pepper spray and pepper balls, Plaintiff and the other three inmates continued to resist staff's repeated orders to "get down," (DX10, Plaintiff's Answers to Second Requests for Admissions No. 40-41), and Plaintiff made several threatening statements and movements toward staff including:

(1) "You're p*ssies, man."

    (2) "F*ck you," on a number of occasions.

    (3) "Shoot me," on at least three occasions.

    (4) "D*mn it, Shults, you motherf*cker," referring to one staff member by name.

    (5) "You guys are some serious p*ssies," while approaching staff at the front of the recreation cage.

    (6) "Hit me, man," and "Hey, look, you're a p*ssy," while walking toward staff and raising his hand.

    (7) "Hey look, look, let's get real," after approaching staff at the front of the recreation cage.

    (8) "You're just p*ssing me off!"

DX7, File: Video Excerpts/1I – 031010-031500.mpg.

       Despite the use of pepper spray and multiple pepper ball rounds, it was not until the firing of a warning shot from a sting ball launcher that Plaintiff and the other three inmates complied with orders to get on the ground. *Id.* No further chemical munitions were used on Plaintiff after he complied with staff orders to lay on the ground. DX10, Plaintiff's Answers to Second Requests for Admissions No. 42. As the use of force teams began cutting down the barricades on the recreation cage door, one of the other inmates, Francis Lang, jumped up and charged the team requiring the firing of additional pepper ball rounds. *Id. See also* DX1, SHU Still Cam 2.

       After the use of force team entered the recreation cage, Warden Bledsoe made the decision that Plaintiff and the other three inmates should be placed in four-point restraints. DX9, p. 9, 156. As required by BOP policy, only the Warden could order four-point restraints in this situation. DX12, § 10.

       Warden Bledsoe determined that Plaintiff and the other three inmates displayed signs of imminent violence because they acted as a group in refusing to submit to staff orders to cuff up for movement from the recreation cage back to their cells, they barricaded the door to the

recreation cage and the area above the door, they refused to submit even after the use of pepper spray and pepper balls, and even after the inmates had gotten on the ground after a shot from the sting ball launcher, Lang got up and moved toward the staff members entering the cage until he was hit with additional pepper ball rounds.  DX8, at ¶¶6-10.  Based on this conduct, Warden Bledsoe determined that four-point restraints were the only means available to maintain control over Plaintiff and the other three inmates once the effects of the pepper spray and pepper balls wore off, and once the use of force teams were no longer physically restraining the four inmates. *Id.* at ¶¶12-13.

Warden Bledsoe made this decision because of the threat of imminent violence indicated by the actions of Plaintiff and his cohorts in the recreation cage, and the high level of anger and agitation they displayed minutes before they were forcibly restrained and removed from the recreation cage.  *Id.*  Left unrestrained in their cells, or restrained only with ambulatory restraints, Plaintiff and the other three inmates could carry out their threats and act on their anger and agitation by assaulting staff who needed to enter their cells to check on them, medically evaluate them, deliver meals, and perform the other tasks requiring staff to enter their cells, or by destroying the property in their cells.  *Id.* at ¶ 14; DX9 p. 161, 201.

Warden Bledsoe testified in his deposition as follows:

```
12          Q And to the extent it reinforced the view, what had
13     formed that view earlier?
14          A Well, the situation did. You have four inmates
15     barricaded in a recreation cage, refusing to submit to staff
16     orders to comply, to cuff up, to be removed from that cage.
17     Not only did they barricaded, they tied off the door where
18     staff couldn't enter or exit the rec cage. Tied up a sheet
19     to the top of cage, which was every indication they were
20     going to go through with their plans.
21     To me they were -- they were -- I guess I have to
22     go back to history on these inmates as well. They all had
23     histories of disruptive behavior. They all had histories of
```

24     assault and other things like that.
25      Suazo and Lang -- I believe was Lang, but I know
1      Suazo, just a short time before that had -- had similar
2      action. Went out to the rec cage, crawled on top of the
3      sallyport to the rec cage. Had put a towel up there to try
4      to hide himself or get behind the towel so staff -- if they
5      had to use force on him, couldn't use chemical agents on him.
6      So they -- they had escalated this, had stepped it
7      up a little bit further. And they were refusing to come out
8      and give up peacefully, even though they had already
9      mentioned what their issue was.

DX 9, at 12-13.

23          Q Why? Why did you need four point restraints as
24     opposed to ambulatory restraints?
25               ***
1          THE WITNESS: Okay, because we had a group
2      demonstration involving four inmates who had tied off the rec
3      cage door, who had also taken a sheet out there and put it up
4      to block either the view or the access to those inmates by
5      staff. We had inmates out there that were being disruptive,
6      refused to come in off the rec yard. Repeatedly threatened
7      staff when they were out there, refused to comply.
8          Other inmates in the unit were also hearing this.
9      In fact, even on video when they trying the remove some
10      inmates around in the unit, they asked about what was going
11      on out there with Montgomery, and this is -- is this for him.
12     And they refused to comply to staff orders even within the
13     unit. So it had already spilled over to the unit. So this
14      was a situation that I thought deemed use of four point
15     restraints. It was beyond just putting them in ambulatory
16     restraints.

DX 9, p. 199-200.

Warden Bledsoe did not take any action for the purpose of punishing Plaintiff or the other

three inmates.  As he testified in his deposition:

5          Q When you ordered -- Warden Bledsoe, when you
6      ordered Montgomery to be four pointed after this incident,
7       that was punishment for his involvement in this activity in
8      the rec cage, wasn't it?
9               A No.
10               Q Did punishment factor into your decision at all?

|    |                                                       |
|----|-------------------------------------------------------|
| 11 | A No.                                                 |
| 12 | Q What did factor into your decision?                 |
| 13 | A The extreme disruptive nature of the incident.      |

DX9 p.159.

Shortly after ordering Plaintiff and the other three inmates into four-point restraints, he visited the SHU with other members of the executive staff for about 20 minutes, from about 3:30 p.m. to 3:50 p.m.  DX11, SHU Visitor Log.  Warden Bledsoe then left USP Lee for the weekend. *Id.* at ¶15.  Plaintiff admits that he never saw Warden Bledsoe while he was in restraints.  DX10, Plaintiff's Answers to Second Requests for Admissions No. 44.

After the initial decision by Warden Bledsoe to place Plaintiff and the other three inmates in four-point restraints, it was left to the discretion of subordinate Lieutenants to determine when Plaintiff should be released.  DX9 p. 156.  BOP policy provides that restraint placement was to be reviewed "by a Lieutenant every two hours to determine if the use of restraints has had the required calming effect and so that the inmate may be released from these restraints (completely or to lesser restraints) as soon as possible."  DX12, § 10(e).

Warden Bledsoe's co-defendants are the four Lieutenants charged with the responsibility of conducting the two-hour reviews of the restraints applied to Plaintiff and the other three inmates.  Warden Bledsoe was not involved in the two-hour checks, (DX8 at ¶16), and none of his co-defendants testified in deposition that Warden Bledsoe directed them to conduct the restraint in any particular way or for any particular amount of time.  Indeed, discovery confirms that the Lieutenants exercised their discretion as provided for in the Program Statement (DX12, § 10(e)).  *See* DX13 7-6-09 Defendants' Answers to Interrogatory 3: "The initial decision to place Plaintiff in four-point restraints was made by Warden Bledsoe.  The decisions to maintain Plaintiff in four-point restraints were made every two hours by the lieutenant as specified in BOP

policy.  In this case, Defendant Lopez, Defendant Peltier, and Lieutenant Grieve, each acting independently, were the decision-makers as to four-point restraints, and Defendant Peltier, Defendant Lopez, and Lieutenant Friss, each acting independently, were the decision-makers as to ambulatory restraints."  Finally, Warden Bledsoe had been at USP Lee only since June, 2004, about six weeks before this incident, (DX 9 at 46, 126, 160), and Plaintiff has no evidence that Defendant Bledsoe was provided with any information to indicate that the Lieutenants were improperly exercising their discretion in deciding how Plaintiff should be restrained or when Plaintiff should be released.  DX8, at ¶16.

Warden Bledsoe moves for summary judgment because there is no evidence that he intended to punish Plaintiff, and because he is entitled to qualified immunity.

## ISSUES

1.      Whether Plaintiff's claim related to the initial use of force should be dismissed on the basis of law of the case;

2.      Whether Warden Bledsoe is entitled to qualified immunity where the only act he committed was to order that Plaintiff be placed in four-point restraints after Plaintiff, acting in concert with three other inmates, displayed signs of imminent violence when he and the other inmates refused to cuff up for movement from the recreation cage to their cells, barricaded the door to the recreation cage and the area above the door, refused to submit to staff orders after the use of pepper spray and pepper balls, and made gestures and statements that threatened staff shortly before being physically restrained by a use of force team;

3.      Whether Warden Bledsoe is entitled to summary judgment when Plaintiff has no evidence that Warden Bledsoe ordered Plaintiff placed into four-point restraints for the sole purpose of causing harm, no evidence that Warden Bledsoe had any role in the decisions to keep

Plaintiff in restraints, or had any reason to think that the continued restraint might be improper, and no evidence that Plaintiff suffered any injury from the acts Warden Bledsoe is alleged to have been committed; and

4.      Whether the statute of limitations bar Plaintiff's claims related to ambulatory restraints, and all of the claims in the Second Amended Complaint against Defendants Bledsoe, Grieve and Friss.

## <u>SUMMARY OF ARGUMENT</u>

Insofar as Plaintiff continues to challenge the initial decision to apply four-point restraint, Judge Kiser already ruled that it was lawful.  (Dkt. No. 141 at pp.9-12.)  That decision is law of the case, and should not be reconsidered.

Warden Bledsoe is entitled qualified immunity for ordering that Plaintiff be placed in four-point restraints after Plaintiff, acting in concert with, and as leader of, three other inmates, displayed imminent violence by refusing to cuff up for movement from the recreation cage to cells, barricaded the entrance and a portion of the recreation cage above the entrance, refused to submit to staff orders even after the use of pepper spray and pepper balls, made threatening gestures and statements to staff throughout staff's attempt to gain control of the inmates, and displayed a high level of anger immediately before being forcibly restrained and removed from the recreation cage and placed into four-point restraints.

In addition, Warden Bledsoe is entitled to summary judgment because he ordered Plaintiff placed in four-point restraints to maintain order and control after the imminent violence, the extreme disruption, and the agitation and anger displayed by Plaintiff in the recreation cage and not for the sole purpose of causing harm, because he had no role in the duration or condition of Plaintiff's restraints, and had no reason to know that the duration and conditions might be

improper, and because Plaintiff suffered no harm from Bledsoe's decision to place him into four-point restraints.

In addition, the claims in the Second Amended Complaint concerning ambulatory restraints and all of the claims against Defendants Bledsoe, Grieve and Friss are barred by the statute of limitations because the claims arose more than two years ago and do not relate back to timely filed claims Fed.R.Civ.P 15(c)(1)(C) or (c)(2).

## ARGUMENTS AND AUTHORITIES

### 1. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted when "there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). For the evidence to present a "genuine" issue of material fact, it must be "such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Facts are deemed material if they might affect the outcome of the case. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).

In deciding a summary judgment motion, the Court views the record as a whole and in the light most favorable to the non-moving party. *Terry's Floor Fashions, Inc. v. Burlington Indus., Inc.,* 763 F.2d 604, 610 (4th Cir.1985). "If, however, 'the evidence is so one-sided that one party must prevail as a matter of law,' we must affirm the grant of summary judgment in that party's favor." *O'Connor v. Consol. Coin Caterers Corp.,* 56 F.3d 542, 545 (4th Cir.1995) (quoting *Anderson,* 477 U.S. at 251-52). Moreover, summary judgment must be granted where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial,"

*Celotex,* 477 U.S. at 322, as the non-moving party is required to "set forth specific facts showing that there is a genuine issue for trial" with respect to that element.  Fed.R.Civ.P. 56(e).

## 2.  **Warden Bledsoe is Entitled to Qualified Immunity.**

Qualified immunity shields government officials who perform discretionary governmental functions from civil liability so long as their conduct does not violate any "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Individual capacity suits "can entail substantial social costs, including the risk that fear of personal liability and harassing litigation will unduly inhibit officials in the discharge of their duties."  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).[1]  Qualified immunity guards against these costs by "ensur[ing] that [government] officials can perform their duties free from the specter of endless and debilitating lawsuits."  *Torchinski v. Siwinski*, 942 F.2d 257, 260-61 (4th Cir. 1991).  "Without such an immunity, the operations of government would be immobilized."  *Id.*

Qualified immunity, therefore, is more than just freedom from liability—it is "an entitlement not to stand trial or [to] face the other burdens of litigation."  *Brown*, 278 F.3d at 366-67 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  The Supreme Court "repeatedly [has] stressed" that courts should effectuate this entitlement by applying qualified immunity "at

---

[1]In *Harlow v. Fitzgerald*, the Supreme Court listed among the social costs of *Bivens* suits "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office."  457 U.S. 800, 814 (1982).  The Court also cited "the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the more irresponsible [public officials], in the unflinching discharge of their duties."  *Id.* (quoting *Gregoire v. Biddle*, 117 F.2d 579, 581 (2d Cir. 1949)).

the earliest possible stage of litigation." *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (quoting *Hunter v. Bryant*, 502 U.S. 244, 227 (1991) (per curiam)).

A government official's entitlement to qualified immunity is determined by a two-prong test. "Officials have qualified immunity either if the facts do not make out a violation of a constitutional right or if the right was not clearly established at the time." *Snider v. Seung Lee*, 2009 WL 3233831, *4 (4th Cir. 2009).

On summary judgment, a district court considers whether the facts alleged, taken in the light most favorable to the plaintiff, support a claim that the defendant violated the plaintiff's rights. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). As well, a court considers whether, at the time of the violation, the right alleged to have been violated was clearly established, that is, in the light of pre-existing law the unlawfulness must be apparent. *Id*. After *Pearson v. Callahan*, 555 U.S. ___, ___, 129 S.Ct. 808, 818-19 (2009), a court has discretion to determine the order of a qualified immunity analysis.

In addition, in order for Plaintiffs to establish a *Bivens* claim against each of the Defendants, Plaintiffs must specify the acts taken by each which violated Plaintiffs' constitutional rights because liability in a *Bivens* case is "personal, based upon each defendant's own constitutional violations." *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (internal citation omitted). There is no respondeat superior liability. *Id.*

In this case, Plaintiff continues to challenge the initial decision to apply four-point restraints after his dangerous and threatening behavior in the recreation cage. Judge Kiser, however, has already ruled that the initial placement in restraints was constitutional as a matter of law. (Dkt. No. 141 at pp.9-12.) Under the doctrine of law of the case, the issue should not now be

reconsidered.  *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (*quoting Messenger v. Anderson*, 225 U.S. 436, 444 (1912)).

At that time of Judge Kiser's ruling, the question was whether putting Plaintiff in four-point restraints in these circumstances evidenced malice on the part of the correctional officers.  Judge Kiser ruled it did not.  The same analysis applies here:  qualified immunity is proper unless Plaintiff can show that Warden Bledsoe's actions were done to wantonly punish him, and Plaintiff has no such evidence.  A ruling different than Judge Kiser's would make a split in this District, which itself would suggest that the law is not clearly established.  "If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy."  Wilson v. Layne, 526 U.S. 603, 618 (1999).

Warden Bledsoe made the decision to order that Plaintiff and the other three inmates be placed into four-point restraints when the use of force team entered the recreation cage to physically restrain the inmates.  DX8, at ¶12.  This decision occurred within minutes of the group's concerted effort, led by Plaintiff, to provoke the use of force by prison staff by barricading the entrance to the recreation cage, refusing to comply with orders to get on the ground, by making threatening gestures and statements to staff, and failing to submit even after the use of pepper spray and pepper balls.  Bledsoe stated that based on these facts, he believed that the only way to maintain order and control of Plaintiff and the other three inmates, and to prevent them from assaulting staff and destroying property based on their anger and high state of agitation, was to order them placed into four-point restraints.  *Id.*, at ¶12-14.

Bledsoe, like all prison officials, must be granted great deference in controlling potentially dangerous inmates.  *Hudson v.McMillan*, 503 U.S. 1, 6 (1992).  The Second Amended Complaint fails to allege any facts to support a claim that Bledsoe acted with the

purpose of inflicting wanton and unnecessary pain when he ordered Plaintiff placed in four-point restraints.  In addition, given the circumstances of the recreation cage disturbance the evidence establishes that Bledsoe's decision to order Plaintiff into four-points was reasonable under the circumstances and was done to maintain order and control in the prison and not for purposes of inflicting wanton and unnecessary pain.

Moreover, at the time Bledsoe ordered Plaintiff placed into four-point restraints on August 6, 2004, the existing law provided that Bledsoe's decision to control an inmate with four-point restraints within minutes of a disturbance requiring the use of riot control agents was not *per se* unconstitutional.  *Williams v. Benjamin,* 77 F.3d 756, 763 (4th Cir. 1996); *Sadler v. Young*, 325 F.Supp.2d 689, 702 (W.D.Va. 2004).  In fact, the Fourth Circuit noted that the imposition of four or five-point restraints was "seemingly a not uncommon 'next step,' if verbal commands, show of force, and mace, are ineffective in controlling prisoners."  *Williams,* 77 F.3d at 764. This District quoted *Williams* in this regard in a published opinion rendered on July 21, 2004, just 16 days before Bledsoe's decision to order that Plaintiff be placed into four-point restraints after verbal command, a show of force, and pepper spray and pepper balls had been ineffective in controlling him and the other three inmates.  *Sadler,* 325 F.Supp.2d at 701-02.  As such, there was no apparent unlawfulness in Bledsoe ordering that Plaintiff be placed in four-point restraints in the immediate aftermath of the recreation yard disturbance, especially given the high level of agitation and anger displayed by Plaintiff and his three cohorts.  Accordingly, the Second Amended Complaint against Bledsoe should be dismissed and summary judgment entered in his favor because he is entitled to qualified immunity.

3.      **The Undisputed Facts Show Warden Bledsoe Did Not Commit a Constitutional Violation.**

     a.      **Bledsoe Acted For The Purpose Of Maintaining Order And Control In The Prison And Not Sadistically And Maliciously For The Purpose Of Causing Harm.**

The only actions specifically alleged against Bledsoe in Plaintiff's Second Amended Complaint are:

(1)     Paragraph 21 – ". . . Warden Bledsoe personally and directly approved the use of restraints on Plaintiff."

(2)     Paragraph 43 – "On August 6, 2004, defendant Bledsoe authorized the use of four-point restraints on Plaintiff."

The remaining allegations made against Bledsoe in paragraphs 44-49 are non-specific conclusory statements about Bledsoe's state of mind and legal obligations.  In deciding this motion, Bledsoe's conduct should be evaluated independently from that of the other four defendants.  "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Ashcroft v. Iqbal*  129 S.Ct. 1937, 1948 (2009)

To make an Eighth Amendment claim, Plaintiff must allege facts sufficient to show that Bledsoe "acted with a sufficiently culpable state of mind (subjective component) and [that] the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)."  *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).  The Second Amended Complaint fails to meet this showing.

Plaintiff alleges that Bledsoe "personally and directly approved the use of restraints," and "authorized the use of four-point restraints," yet provides no facts that indicate that Bledsoe did so "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline."  *See Stanley v. Hejirika*, 134 F.3d 629, 634 (4th

Cir. 1998) (*quoting Hudson v. McMillian*, 503 U.S. 1, 6 (1993)).  To evaluate the subjective component, the court evaluates the following factors: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response. *See Whitley,* 475 U.S. at 321.

Bledsoe's decision that restraints were needed was reasonable after he observed Plaintiff and his three cohorts threaten imminent violence by refusing to comply with staff orders to cuff up for movement back to their cells, by barricading the recreation cage door and the fence above the door, by refusing to submit despite the use of pepper spray, by refusing to submit despite the use of pepper balls, by making threatening gestures and comments against staff, and by displaying a high degree of agitation and anger just minutes before they were forcibly removed from the recreation cage.  Under these conditions, Bledsoe's decision to restrain Plaintiff and the other three was justifiable and it was reasonable for him to perceive that without restraints the inmates would carry out their threats and assault staff or otherwise display their anger and agitation by destroying property in their cells.  *Williams*, 77 F.3d at 762-763.  Accordingly, the undisputed and irrefutable facts of the Plaintiff-led recreation yard disturbance support Bledsoe's decision to employ restraints to maintain order and control and to prevent Plaintiff and the other three inmates from carrying out their threats against staff or to otherwise express their anger and agitation.

The second factor is also met where leaving the inmates in their cells without restraints or with only ambulatory restraints would not prevent them from acting on their high degree of anger and agitation by assaulting staff needing to enter their cells for various administrative purposes or by destroying property in the cells.  Given the inmates' threatening behavior and

high degree of agitation and anger displayed just minutes earlier, it was not clear to Bledsoe that their threatening behavior, agitation, and anger would not return once the effects of pepper spray and pepper balls had worn off and the inmates were no longer physically restrained by four to five staff members.  Accordingly, four-point restraints were needed to maintain order and control and to prevent assaultive and destructive behavior after the pepper spray and pepper balls had worn off and prison staff were no longer physically restraining Plaintiff and his cohorts.  *Id.*, at 764.

Similarly, the fourth factor is met because the decision to apply four-point restraints does not suggest malicious or sadistic intent where multiple attempts at confrontation avoidance, repeated verbal commands to comply with staff, use of pepper spray, and use of pepper balls were all ineffective in controlling Plaintiff and his three cohorts.  "Imposition of [four-point] restraints is seemingly a not uncommon 'next' step" where lesser methods such as those used here are ineffective.  *Id.*

**b.  <u>Warden Bledsoe Had No Personal Involvement in the Decision to Maintain the Restraints</u>.**

Warden Bledsoe left USP Lee for the weekend shortly after ordering Plaintiff and the other three inmates into four-point restraints.  DX8 at ¶15.  Still, Plaintiff infers in his Second Amended Complaint, without stating specific acts, that Warden Bledsoe bears culpability for the duration and condition of Plaintiff's restraints.  This is a simple effort to recast an allegation of supervisory liability.

That Warden Bledsoe may have had authority to intercede in and of itself is not sufficient to hold him responsible for any Eighth Amendment violation, and the Second Amended Complaint places Bledsoe in the unfair position of having to defend against indefinite and nebulous allegations that lack sufficient specificity for him to determine what misconduct he is

alleged to have committed.  In fact, the very BOP Program Statement (DX12, § 10(e)) cited by Plaintiff in his Second Amended Complaint indicates that the duration of Plaintiff's restraint was determined by the Lieutenants exercising their discretion during their two-hour checks.  *See* Second Amended Complaint ¶¶30-36.  The facts in the record indicate that this procedure was followed, and that Bledsoe had no role in the decision to continue Plaintiff's restraints or the conditions under which he was restrained.  "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. . . . [P]urpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities."  *Iqbal*, 129 S.Ct. at 1949.  As a matter of law, then, Warden Bledsoe cannot be responsible for the duration and/or conditions of Plaintiff's restraint.

  c. **Plaintiff Does Not Show Any Pain Or Injury From Bledsoe's Order That He Be Placed In Four-Point Restraints And The Order Was Not Repugnant To The Conscience Of Mankind.**

  To satisfy the objective component of the test for an Eighth Amendment violation, a plaintiff must demonstrate more than *de minimis* pain or injury, or that any force used was "repugnant to the conscience of mankind."  *Norman v. Taylor*, 25 F.3d 1259, 1263 (4th Cir. 1994).  While it is true that Plaintiff "need not show that the force used caused an 'extreme deprivation' or 'serious' or 'significant' pain or injury to establish a cause of action," *id.* (quoting *Hudson,* 503 U.S. at 9), Plaintiff cannot show any pain or injury caused by Bledsoe's legitimate order that he be placed in four-point restraints after the extreme disruption and imminent violence displayed on the recreation yard.

**4.**      **The Second Amended Complaint is Barred By the Statute of Limitations.**

Defendants reassert the argument made before in this case that relation back should be decided in a *Bivens* case under Fed.R.Civ.P. 15(c)(1)(C) rather than 15(c)(2).  As such, the claims in the Second Amended Complaint concerning ambulatory restraints and all of the claims against Defendants Bledsoe, Grieve and Friss are barred by the statute of limitations.

The facts at issue in this case occurred in August, 2004.  Plaintiff filed a Complaint on March 7, 2005, an Amended Complaint on May 8, 2007, and a Second Amended Complaint on August 24, 2009.  Plaintiff's Second Amended Complaint included five counts.  Three of the counts in the Second Amended Complaint, Counts I, IV and V, added Defendants Bledsoe, Grieve, and Friss, respectively.  Counts II and III of the Second Amended Complaint added new claims against Defendants Peltier and Lopez, respectively.  Under Virginia Code Ann. ¶ 8.01-243(A), the statute of limitations ran in August, 2006, and the new claims are barred unless they relate back to the Complaint filed in 2005.

This Court previously ruled that a relation-back analysis in this case should not be under the actual-notice provisions in Fed.R.Civ.P. 15(c)(1)(C), but under the special constructive-notice provision of Fed.R.Civ.P. 15(c)(2), notwithstanding the fact that this is a *Bivens* case. (Dkt. No. 215 at 13-16; Dkt. No. 288 at 4.)[3]  Defendants again argue that the Court should apply the actual-notice provision of Fed.R.Civ.P. 15(c)(1)(C) because Fed.R.Civ.P. 15(c)(2) should apply only to suits brought against government employees in their official capacity, and should not apply to *Bivens* suits.

The language of Fed.R.Civ.P. 15(c)(2) addresses when a plaintiff sues "the *United States* or a United States officer or *agency*," *i.e.*, the sovereign or one of its agents acting on behalf of

---

[3] Defendants reassert their objections to the Court's earlier rulings on relation back at Dkt. Nos. 215 and 288.

the sovereign.  Indeed, the title of the provision, "Notice to the United States," reinforces that argument.

In addition, Fed.R.Civ.P. 15(c)(2) requires notice only to a *government* lawyer.  That provision makes sense when an employee is sued in an official capacity, because in that situation, the individual will be represented by the government, and thus notice to the lawyer is properly imputed to the individual defendant.  An individual sued in his personal capacity under *Bivens*, however, is not guaranteed representation by government counsel, so it would be unreasonable for the Rules to operate in such a way that does not guarantee notice to an individual's attorney.

As the 1966 Advisory Committee Notes explain, the history of the provision shows that it was added to respond to situations in which a plaintiff accidentally sues the wrong governmental agency and the government knows that it has been sued.  Indeed, as this Court recognized in its earlier opinion, (Dkt. No. 215 at 13-16), the provision was enacted before *Bivens* was decided, reflecting the fact that Congress obviously did not have individual capacity suits in mind.

Defendants' argument is consistent with Fed.R.Civ.P. 15(c)(1)(C), which permits relation back only when the proper party has actual notice of the suit, when he would not be prejudiced by the amendment, and when he knew or should have known that he was the correct party to be sued.  Those conditions are essentially satisfied when official capacity suits are brought against the wrong party because, as explained by the Advisory Committee Notes, the policy behind statutes of limitations are not implicated when the government is sued within the applicable time period and the complaint merely misidentifies the official.  By contrast, when an individual employee is sued in his personal capacity, there is a real danger of prejudice to the new party that

is not ameliorated simply because government counsel was timely served with the original complaint.

As the Court acknowledged in its first opinion on this issue, (Dkt. No. 215), there exists a split of opinion among courts that have considered whether the constructive notice provision of Fed.R.Civ.P. 15(c)(2) extends to employees sued in their individual capacity.  (*Id.* at 14-16.)  In holding that Fed.R.Civ.P. 15(c)(2) applies in *Bivens* cases, the Court expressly declined to follow the two Seventh Circuit opinions on point, *Delgado-Brunet* v. *Clark*, 93 F.3d 339, 344 (7th Cir. 1996), and *Lojuk* v. *Johnson*, 853 F.2d 560, 563 (7th Cir. 1988).

As the *Lojuk* court observed, the constructive notice provision was intended "to facilitate a citizen's suit against his sovereign by eliminating an unnecessary trap for the unwary" who unknowingly sue the wrong governmental agency. *Id.* at 563 (internal quotation omitted).  The provision was added to address situations in which a person challenging the denial of federal benefits unknowingly misstates the name of the agency or includes a retired Secretary as a defendant, and does not learn of the mistake until after the statute of limitations has expired. Under these circumstances, the Advisory Committee Notes observed, "[t]he policy of the statute limiting the time for suit . . . would not [be] offended by allowing relation back" to name the proper agency or Secretary because the government has already been put on notice of the claim. Fed. R. Civ. P. 15(c) Advisory Committee Notes, 1966 Amendment.

Where a newly named defendant is sued in his or her individual capacity, however, "[n]o comparable situation exists." *Lojuk*, 853 F.2d at 563. There is no reason to believe that an individual employee would become aware of a pending *Bivens* suit in which he is not a named defendant simply because the plaintiff served the U.S. Attorney or Attorney General.  Indeed, an attorney-client relationship arises between an individual employee and the Department of Justice

only after the employee has been named as a defendant in a lawsuit, has requested representation by the U.S. Attorney, and such representation has been authorized and undertaken. *See* 28 C.F.R. § 50.15. Representation is not automatic. There is no guaranteed representation by the Department of Justice. It is very possible that an employee's request for representation would be denied, and he or she would need to obtain private counsel. Accordingly, the constructive-notice provision of Fed.R.Civ.P. 15(c)(2) is out of place in a *Bivens* suit.

The Seventh Circuit reasoned that the rationale for the constructive notice provision simply has no application in the context of *Bivens* suits, and if the Advisory Committee had intended to strip individual employees of the protections normally afforded by the statute of limitations in such cases, "there would certainly have been a clearer indication." *Lojuk*, 853 F.2d at 563

In this case, Defendants did not have actual notice that would allow relation back. The original Complaint was filed in March 2005, and the case was properly defended on the issue, among others, of whether Plaintiff should be relieved of his obligation to exhaust his administrative remedies. It was not until after the limitations period expired—on October 30, 2006—that the issue of exhaustion was decided. Certain discovery was allowed during the limitations period, and every discovery Order was followed. Plaintiff cannot assert otherwise. So when the limitation period ended in August 2006, the only individuals on notice were those already named in the original Complaint. It is a plaintiff's burden to identify and name the proper defendants during the limitation period. Even if given the benefit of the time allowed for service under Fed.R.Civ.P. 4(m), and considering Plaintiff proceeded in forma pauperis pursuant to § 1915(b), the Defendants did not have the necessary notice.

### a.  <u>Defendants Did Not Have Actual Knowledge of the Suit</u>.

#### i.  <u>Friss</u>.

Plaintiff argued earlier in the case that: "[t]here certainly can be no question as to whether there is relation-back of the Second Amended Complaint as to Friss, as he was named in the original Complaint and therefore had actual notice of the lawsuit." (Dkt. No. 280 at 23.)  But notice of the lawsuit is not enough.  In the original Complaint Defendant Friss was accused of mail tampering; he was not identified in the original Complaint as to his involvement in the ambulatory restraints.  A different set of facts underpins a claim of mail tampering and a claim of improper restraint.  Defendant Friss did not know he would be defending a claim of improper ambulatory restraints.  Thus, the claim as to Defendant Friss does not relate back because he did not have notice of the ambulatory restraint claim and is prejudiced in his defense.

#### ii.  <u>Bledsoe</u>.

Plaintiff stated earlier: "[c]learly Bledsoe had actual knowledge of the lawsuit during the applicable period." (Dkt. No. 280 at 23.)  Again, Warden Bledsoe did not have the kind of notice contemplated by a statute of limitations that he would be defending the current claims. The claim against him in Plaintiff's first Amended Complaint was dismissed by the Court *sua sponte*, and Warden Bledsoe was never involved in the defense.  His notice of the lawsuit in September 2005, was only to advise him that certain staff members would be away from USP Lee for the evidentiary hearing, and not for purposes of preparing a defense against these allegations.  Thus, Warden Bledsoe too was prejudiced by the time lapse.

#### iii.  <u>Grieve</u>.

Defendant Grieve did not learn of this lawsuit until February 23, 2009, when the case was being prepared for trial on the issue of Plaintiff's behavior while in four-point restraints.  DX14,

Grieve Declaration dated 7-24-09, at ¶ 3-4.  In addition, Defendant Grieve testified in his

deposition that he only learned about the lawsuit recently.

```
15        Q.   Have you spoken with any lawyers with
16     the Bureau of Prisons?
17        A.   Initially I found out that I was being
18     named that lawsuit by Debbie Stevens, legal counsel
19     for the Bureau of Prisons.
20        Q.   Was that fairly recently?
21        A.   Yes.
```

DX 15, Grieve Dep. p.21.

Nobody spoke with Defendant Grieve when his name was included in the list of involved

lieutenants, and filed with the Court, in May, 2006.  DX15, Grieve Dep. p.25-26.

```
6        Q.   Do you remember, do you know that
7     Plaintiff had filed a lawsuit in 2005?  Do you
8     remember discussion by Friss, for example, that a
9     lawsuit had been filed?
10        A.   In 2005, no, I didn't know anything
11     about it.
12        Q.   You hadn't heard from anyone at the
13     penitentiary that a lawsuit had been filed until
14     when?
15        A.   Until I got the e-mail from Debbie
16     Stevens a couple of months ago.
17        Q.   So the Grieve Number 1 that we looked
18     at, you didn't know that that had been filed?
19        A.   No.
```

DX15, Grieve Dep. p.145.

There was no reason to think Defendant Grieve would be named as a defendant when in

2006, Plaintiff was provided with Defendant Grieve's name as a decision-maker, and yet he did

not add him to the suit.  Plaintiff failed to take proper steps to advise Defendant Grieve he could

be subject to litigation.  Accordingly, Defendant Grieve did not have actual knowledge of the

suit within the limitations period.

## CONCLUSION

For the foregoing reasons Defendants are entitled to summary judgment.

Respectfully submitted,

TIMOTHY J. HEAPHY
United States Attorney

/s/ Sara Bugbee Winn
Sara Bugbee Winn, VSB #35924
Assistant United States Attorney
United States Attorney's Office
P. O. Box 1709
Roanoke, VA 24008-1709
TEL (540) 857-2254
FAX (540) 857-2283

## CERTIFICATE OF SERVICE

I hereby certify that I have this _30th_ day of __October__ , 2009, caused the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** to be electronically filed with the Clerk of the Court using the CM/ECF system, which will provide a copy thereof to the following:

Lonnie D. Nunley, III
Carrie Bowden Freed
Dustin M. Paul
HUNTON & WILLIAMS, LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

/s/ Sara Bugbee Winn
Assistant United States Attorney